RIDGE REALIZATION CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2907–62. Filed March 4, 1966.

*Jerome R. Hellerstein* and *Victor Brudney*, for the petitioner.
*James Q. Smith*, for the respondent.

HOYT, *Judge:* The respondent determined a deficiency in petitioner's income tax for the calendar year 1959 in the amount of $387,990.58. The sole issue for decision is whether an amount of $800,000 recovered by petitioner in partial settlement of a litigation claim in 1959 must be included in taxable income.

FINDINGS OF FACT

Most of the facts have been stipulated. The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. Some of the facts which have been agreed upon will be set forth hereinafter in detail.

Petitioner is a corporation organized on April 27, 1951, under the laws of the State of Delaware, with its principal office in New York City. Its Federal income tax return for the year 1959 was filed with the district director of internal revenue in New York City. Petitioner

maintains its books and files its tax returns on the accrual system and calendar year basis.

On or about March 30, 1959, petitioner was paid $800,000 by Countess Mona Bismarck, the widow of Harrison Williams, in partial settlement of an action initiated for the benefit of petitioner and its stockholders against Harrison Williams and certain former officers and directors of Blue Ridge Corp. which action is still pending against other parties in the U.S. District Court for the Southern District of New York.

The circumstances behind the organization of petitioner were as follows: In 1942 a reorganization proceeding under chapter X of the Bankruptcy Act was begun, involving Central States Electric Corp. (referred to as Central States), Blue Ridge Corp. (referred to as Blue Ridge), and American Cities Power & Light Corp. (referred to as American Cities). Prior to reorganization all three of these corporations were publicly owned closed-end investment companies; Central States owned, either directly or indirectly, controlling interests in both American Cities and Blue Ridge. At the time the bankruptcy court approved the final plan in 1950, Central States held approximately 31 percent of Blue Ridge's outstanding stock and 82 percent of American Cities' outstanding shares; American Cities in turn owned approximately 42 percent of the outstanding shares of Blue Ridge and Blue Ridge owned 806,248 shares of Central States stock (approximately 8 percent). Central States, a closed-end investment company, had outstanding multiple series of bonds and preferred stock; American Cities and Blue Ridge, both also closed-end investment companies, had no senior securities outstanding.

In addition to its holdings of securities and some cash, Central States had interests in certain contingent assets. These consisted principally of a pending lawsuit brought by its trustees in reorganization against Harrison Williams, a former director, and others, and its interest in Blue Ridge's contingent assets. Blue Ridge's contingent assets, in turn, consisted of two separate lawsuits of which one was a stockholder's derivative suit brought by Harry Marco on behalf of Blue Ridge against Harrison Williams and certain other former directors and other persons (hereinafter referred to as the Marco action). The other lawsuit was one which had been brought directly by Blue Ridge against Central States, American Cities, Harrison Williams, and Onondaga Corp.

The plan of reorganization finally developed and approved was designed to combine the assets of Central States and Central States' portion of the assets of its two subsidiaries, American Cities and Blue Ridge, into one new open-end investment corporation, the stock of which would be owned by Central States initially and distributed by Central States to its creditors, bondholders, and preferred stockholders

in their order of priority. However, in order for the creditors of Central States to be paid with stock of the newly formed corporation it was essential that the new corporation's stock have a readily ascertainable market value based on net asset values. This requirement of the plan would be defeated if the new corporation were to hold as assets the contingent lawsuit claims of Central States and Blue Ridge. Also, the reorganization could not be delayed, in fairness to the debenture holders and 7-percent preferred stockholders of Central States, until the lawsuits were reduced to judgment. It was not necessary to transfer the contingent assets to the reorganized company in order to preserve them for the security holders and to consummate the reorganization under chapter X. Hence, these contingent assets had to be dealt with outside of the reorganized corporation.

The reorganization plan provided for the segregation of the contingent assets of Central States and of Blue Ridge and that the contingent assets of Blue Ridge be transferred to a trustee or corporation for the benefit of shares or certificates of interest therein which were to be distributed to the stockholders of Blue Ridge, including Central States. The plan also provided that the contingent assets of the estate consist of the following:

(a) The Trustee's lawsuit against Harrison Williams, and others.

(b) The interest of Central States in contingent assets of Blue Ridge, represented by separate lawsuits instituted by or on behalf of Blue Ridge against Harrison Williams, and others.

(c) Possible minor miscellaneous recoveries which might be received upon final dissolution of American Cities, and any other contingent assets.

It then specified that the net proceeds of the contingent assets should be distributed to Central States' respective shareholders.

The following steps were taken pursuant to the plan finally adopted in 1950 and approved by the court:

(1) American Cities redeemed the stock of all its public shareholders and then liquidated, distributing its remaining assets to Central States.

(2) Ridge Realization Corp., petitioner in the instant case, was created under the laws of Delaware, and the lawsuits begun by Blue Ridge and Marco (for the benefit of Blue Ridge), $300,000 in cash, and the 806,248 shares of Central States common stock (which might be required for tender in the pending litigation) were assigned by Blue Ridge to petitioner solely in exchange for 7,422,483 shares of petitioner's common stock (all of the issued and outstanding shares). Both petitioner and Blue Ridge treated this transaction as a nontaxable exchange of stock for assets and reported no gain or loss therefrom in their income tax returns.

(3) Blue Ridge then distributed this stock in petitioner to its public shareholders and to Central States according to their respective

interests in Blue Ridge, with Central States receiving approximately 66 percent thereof.

(4) A new corporation, Blue Ridge Mutual Fund, Inc., was created in the form of an open-end investment company (hereinafter sometimes referred to as the reorganized corporation), and to it Central States transferred all of its assets except its contingent lawsuit against Williams, et al., certain cash and 66 percent of the stock of Ridge Realization Corp. which it had acquired from Blue Ridge, in exchange for stock in the reorganized corporation.

(5) Divested of its contingent assets, Blue Ridge merged into the reorganized corporation (Blue Ridge Mutual Fund, Inc.), and upon completion of the merger its stock in the new company was distributed to Blue Ridge stockholders, including Central States.

(6) Central States distributed its stock in the reorganized corporation to its bondholders and preferred stockholders in order of their priorities.

At the completion of these transactions the reorganized corporation owned all of the assets of the Central States group except some cash, certain specifically reserved assets, and contingent assets in the form of pending lawsuits. Bondholders and some of the preferred stockholders of Central States were satisfied by stock in the reorganized corporation, and Central States continued to own its own lawsuit against Williams, et al., plus 4,900,788 shares of stock in petitioner (66 percent), whose only significant assets were the other two lawsuits against Williams, et al. Any amounts received by Central States either from its own lawsuit or from its share of proceeds from petitioner's lawsuits would be distributed to remaining shareholders who had not been satisfied previously from the distribution of shares in the reorganized corporation, in the order of their priority of claim specified by the plan.

Of the two actions assigned by Blue Ridge to petitioner in the reorganization proceedings, one was an action begun in 1946 by Blue Ridge itself against Harrison Williams, Central States, American Cities, and Onondaga Corp., a wholly owned instrumentality of Harrison Williams. This action had been settled with respect to Central States and American Cities in 1948. Thus, at the time of the assignment in reorganization this action remained alive only as to defendants Harrison Williams and Onondaga Corp., and as to these defendants the suit was discontinued by petitioner and dismissed in 1957, subsequent to the death of Harrison Williams. The amounts received in settlement by Blue Ridge in 1948 from Central States and American Cities were determined by the Commissioner in a ruling to be excludable from income under the so-called tax benefit rule.

The other action assigned by Blue Ridge to petitioner was an action which had been commenced by Harry Marco in 1936 in the New York

**512**

courts against Harrison Williams and others as a stockholder's derivative action brought on behalf of Blue Ridge. The Marco action has had a long and complex odyssey through the various levels of the State and Federal courts of New York, and at the time of trial in the instant case it was still being prosecuted by petitioner.[1]

In 1959 a settlement was reached by petitioner with one of the defendants in the Marco action: Petitioner was paid $800,000 by Countess Mona Bismarck, the widow of Harrison Williams, in full settlement of all claims against the estate of her late husband under the Marco action, and the action was dropped as against the estate but continued as to the other named defendants. The complaint in the Marco action as it stood at the time the above-mentioned settlement was effected contained, in addition to general averments of conspiracy and breach of fiduciary obligation, the following specific allegations:

16. * * * the Conspirators [i.e., the defendants, some of whom, including Harrison Williams, were directors] used the funds of the Blue Ridge Corporation for the use, benefit and profit of themselves, the Bankers and corporations owned and controlled by Harrison Williams to purchase, acquire and trade in various stocks, bonds and other securities in which said Conspirators, the Bankers and Harrison Williams directly or indirectly were interested either as outright owners of said securities, or as bankers for the companies issuing the securities and/or as underwriters or distributors of said securities and/or in connection with which they were obligated to maintain and support a market. The securities so caused to be purchased by Blue Ridge Corporation were far from the best securities available. The purchases were not for the best interests of the Corporation, but on the contrary said securities were purchased regardless of the rights and interests of the Corporation but in order to enable the Conspirators directly or indirectly to create and maintain a market for such securities; to enable the Conspirators, the Bankers and Harrison Williams directly or indirectly to make enormous profits by unloading such securities on Blue Ridge Corporation, through the dumping or unloading of large blocks of securities of doubtful value at prices greatly in excess of their real or actual value; to enable the Conspirators to secure control of corporations for their own profit and benefit; to enable the Conspirators directly or indirectly to make large underwriting profits and commissions and/or to enable the said Conspirators directly or indirectly to profit and benefit through the acquisition and purchase of said securities by the Corporation. Among the securities so purchased, acquired and bought, were the stock of Conde Nast Publications between on or about October 8th, 1930, and December 23rd, 1933, and the stock of Central States Electric Corporation, between on or about November 30th, 1929, and January 18th, 1934.

\* \* \* \* \* \* \*

19. Pursuant to said conspiracy and in violation of their duties as officers and directors of the Corporation the Conspirators caused the Corporation on or about December 31, 1931, to acquire a note for upwards of $4,000,000 made by one, Conde Nast. The said note was supported by inadequate and unsafe collateral which the Conspirators could or should have known, but was acquired in furtherance of

---

[1] The original action was dismissed in 1958 but a new action based on the same facts was instituted that same year. It was in this new action that a settlement, resulting in the payment herein involved, was reached.

their own individual interests, and pursuant to the scheme, plan and device hereinabove set forth. The Conspirators caused said note to be acquired by the Corporation with knowledge of the fact that said Conde Nast did not have the financial ability to comply with the terms and conditions of said note.

Some of the facts giving rise to these allegations were as follows: Following the stock market crash of October 1929, Blue Ridge suffered tremendous losses in the market value of its portfolio. On December 6, 1929, Onondaga Corp. (Onondaga), a wholly owned affiliate of Harrison Williams, sold to Blue Ridge, pursuant to an agreement between them dated December 4, 1929, 178,771 shares of Central States common stock in exchange for 10 blocks of diversified marketable securities which had cost Blue Ridge $6,153,775. It is this transaction (hereinafter called the Central States stock transaction) to which the above-quoted paragraph 16 of the Marco action complaint refers, on the ground that the Central States stock was worth far less than the securities exchanged for it by Blue Ridge. Blue Ridge reported the exchange with Onondaga as a loss on its 1929 Federal income tax return. The return was audited and Blue Ridge and the Commissioner agreed that the transaction was closed for tax purposes on December 4, 1929. The loss on the Onondaga–Central States stock transaction was computed to be $1,086,380.71. Petitioner's net loss for tax purposes for 1929 after all adjustments determined by the audit was $433,684.96. Neither petitioner nor Blue Ridge recovered any portion of the loss realized on the 1929 acquisition of 178,771 shares of Central States stock from Onondaga thereafter until the 1959 recovery from Countess Bismarck in settlement of the claims against the Harrison Williams Estate. Blue Ridge's unrecovered basis in this loss underlying the claim against Williams was $433,684.96.

The transaction which underlies the above-quoted allegations of paragraph 19 of the complaint is hereinafter referred to as the Conde Nast transaction. This involved, in essence, a guarantee on October 24, 1930, by Blue Ridge of the repayment by the Vogue Co. (which was controlled by Conde Nast) of $4 million then being loaned to the Vogue Co. by Chase National Bank, fulfillment of that guarantee by Blue Ridge on December 31, 1931, and Blue Ridge's ultimate loss therefrom in 1934 of at least $2,840,000. Specifically, Blue Ridge agreed at the time the loan was made and as part of the loan transaction, that if the Vogue Co. did not repay the loan at maturity (Dec. 31, 1931), Blue Ridge would purchase from the bank for $4 million and any unpaid interest on the loan, the 160,000 shares of common stock of Conde Nast Publications, Inc., which the Vogue Co. was pledging with the bank as collateral for the loan. Also on October 24, 1930, Conde Nast individually agreed to purchase that stock from Blue Ridge for $4,800,000 in the event that Blue Ridge was called upon to fulfill its guarantee.

On December 31, 1931, the Vogue Co. having defaulted in payment of the principal of the loan, Blue Ridge fulfilled its obligation by paying the bank $4 million and on January 2, 1932, it acquired the 160,000 shares of Conde Nast Publications stock from the bank; it then assigned those shares to Conde Nast individually in exchange for his personal note in the amount of $4,800,000, which was secured by the 160,000 shares of stock and other of his assets. Blue Ridge reported a profit on purchase and sale of Conde Nast Publications, Inc., stock on its 1931 Federal income tax return as follows:

| | |
|---|---:|
| Selling price (less commissions of $3,200) | $4,796,800 |
| Cost | 4,000,000 |
| Profit reported | 796,800 |

On audit of the return the revenue agent took the aforesaid profit out of income for 1931 and placed it into 1932 income.

By the end of 1932 the Conde Nast Publications, Inc., stock held by Blue Ridge as collateral on the personal note of Conde Nast had undergone a considerable decline in value and the financial ability of Nast to repay the note was in doubt. Blue Ridge reflected this condition in its financial reports through a valuation reserve against the note receivable. This reserve had been set up on the books when the note was acquired on December 31, 1931, and as of December 31, 1932, it had been increased to $3,560,000. This left a net debit balance for the note receivable as of that latter date of $1,240,000, which represented the then market value of the collateral security. The reserve was created and increased by direct charges to Blue Ridge's capital surplus account, and no reductions of taxable income resulted thereby.

In January 1934, Blue Ridge sold its "position" in the Conde Nast note and collateral for $1 million in cash and 19,000 shares of Conde Nast Publications, Inc., stock having a fair market value of $147,250. Blue Ridge reported the transaction as a bad debt deduction on its 1934 Federal income tax return as follows:

| | |
|---|---:|
| Basis | $4,800,000 |
| Recovery | [1] 1,146,750 |
| Deduction | 3,653,250 |

[1] Apparently erroneously reported in lieu of $1,147,250.

For the year 1934, Blue Ridge claimed on its return an overall net loss of $3,645,693.74 (including the $3,653,250 bad debt deduction). Blue Ridge's 1934 return was never audited by the Internal Revenue Service.

No other deduction, credit, exclusion, or allowance has been claimed by or allowed to Blue Ridge or petitioner in any way on account of the Conde Nast note or with respect to the Conde Nast transaction in or for any year prior to 1959. Blue Ridge's unrecovered basis in the

Conde Nast loss transaction underlying this claim against the Williams Estate was $3,645,693.74.

The reorganization trustees of Central States, after extensive inquiry by counsel and accountants in 1944 and 1945, had been advised that the Conde Nast transaction was the only basis upon which any recovery could be predicated in the Marco litigation. This advice was confirmed for petitioner by the counsel retained by the trustees in 1951. Petitioner and its president, the Central States trustee, have at all times regarded the claim based on the Conde Nast transaction to be virtually the only basis for any recovery which might be made in the Marco action.

Petitioner and its president placed little or no value on the likelihood of effecting any recovery in the Marco action on the basis of the Central States stock transaction, and in their negotiations leading up to the settlement here in controversy petitioner's representatives indicated to the widow of Harrison Williams and her attorney that they were placing primary reliance on the Conde Nast transaction as the basis for the recovery sought in the Marco action.

The settlement, however, which gave rise to the $800,000 recovery here in issue was a unitary one and the agreement between Countess Bismarck and petitioner was a complete settlement of any and all claims and demands petitioner had against the Harrison Williams Estate. The Marco action was to be dismissed with prejudice against the Williams Estate and general releases were to be executed and delivered in favor of Countess Bismarck and the estate. The $800,000 was paid in settlement of all claims against Williams for his derelictions and wrongdoings, without allocation.

Petitioner's sole business activity since its creation has been the conduct of the litigation and the related settlement negotiations. It has engaged in no other business activity of any kind, and no money has been spent by or for it, except for the conduct of that litigation and the performance of its internal corporate household chores—holding annual meetings, sending reports to stockholders, preparing its accounts, paying stock transfer agents' fees, and the like. Petitioner has had no employees of any kind other than a half-time secretary-clerk, and the "outside" services it has purchased have been only those of transfer agents, of accountants to prepare its books and formal statements, and of lawyers to handle its income tax problems. Its officers have received no salaries.

Since petitioner's creation its board of directors has been elected each year by majority vote of its stockholders, and the trustees of Central States have at all times held approximately 66 percent of its stock.

Petitioner's directors consisted, until March 6, 1956, of Robert G. Butcher and Carl J. Austrian, the two trustees of Central States, and

Herbert W. Grindal. Grindal resigned as a director of petitioner on March 6, 1956, and he was replaced on April 16, 1956, by Saul J. Lance, a law partner of Austrian, the surviving trustee. Butcher died on July 26, 1956, and he was replaced as a director of petitioner on August 28, 1956, by Irving B. Stewart, another law partner of the surviving trustee. Petitioner had had no other directors than those named above.

Petitioner's officers, except for a brief time when another partner of Austrian's was assistant secretary, have been only the persons who were the aforementioned directors.

Petitioner's assets have been held almost exclusively in the form of cash and short-term Government bonds.[2] Petitioner has never retained an investment adviser, and although its officers have repeatedly been requested by its stockholders to invest its liquid assets in a varied portfolio of equity securities, they have repeatedly refused to do so and have explained to the stockholders that because petitioner is a realization and liquidation corporation and its function is limited to prosecuting the claims and distributing their proceeds in accordance with the bankruptcy reorganization plan, none of its assets could or would be invested in such securities.

In 1951, at the time Blue Ridge presented to its shareholders the plan to merge into the new reorganized corporation, its management, acting pursuant to authorization from the court, solicited proxies. It was expressly outlined to the Blue Ridge shareholders that the merger of Blue Ridge into the reorganized corporation and the transfer of the lawsuits to petitioner were pursuant to the plan of reorganization of Central States and that prior to the effective date of the merger the corporation would transfer the lawsuits to Ridge; that any recoveries made in the lawsuits would be distributed to petitioner's stockholders who were then the stockholders of Blue Ridge.

When the transfer of Blue Ridge's assets to petitioner was made on June 13, 1951, the assignment contained, *inter alia*, the following language:

WHEREAS, said plan of reorganization provides, as an integral and essential part thereof, that prior to the merger of Blue Ridge into the New Company, as aforesaid, Blue Ridge shall divest itself of certain contingent assets, including, among other things, the claims and demands now being prosecuted on behalf of

---

[2] The only other assets have been certain shares of Central States common stock which might be required for tender in the pending lawsuits and 22 shares of common stock of Standard Oil Co. of California (split into 44 shares while petitioner held them) which were sold some time in 1961 and replaced with 60 shares of common stock of American Telephone & Telegraph Co., which are still held. The reason for holding these nominal amounts of stock of non-New York corporations was to minimize New York State franchise tax. Neither the holding of the aforesaid stocks nor the fact that petitioner qualified to do business in New York signifies that it has done or intends to do any business beyond the conduct of its litigation. The only reason for qualifying to do business in New York was to avoid any dispute as to its right to sue, and thus to continue the Blue Ridge litigation in New York courts.

Blue Ridge in the action hereinafter more particularly described, in order to provide for the equitable distribution among the securityholders of Central States entitled thereto, and the stockholders of Blue Ridge, other than the Trustees, of their respective interests in such contingent assets of Blue Ridge and in order to provide for the fair valuation of the assets of Central States and Blue Ridge to be transferred to the New Company and the fair and equitable distribution of its shares upon the merger above described; and

WHEREAS, Realization has been organized for the purpose of acquiring such contingent assets, including such claims and demands, from Blue Ridge pursuant to the provisions of such plan; * * *

Through the years the bankruptcy court received reports as to the status of the litigation and when the settlement agreement between Ridge Realization and the Countess Bismarck was made, the bankruptcy court entered an order ratifying, confirming, and approving same and approving the action of Carl Austrian, president of petitioner corporation, in reaching the settlement agreement. It ordered and authorized Austrian, not only as trustee but also as president of petitioner corporation, to effectuate the settlement and it approved and ratified his action as petitioner's president in presenting the settlement agreement to the U.S. District Court, Southern District of New York, for its approval.

The lawsuits and other assets transferred to petitioner by Blue Ridge were assigned pursuant to the plan of reorganization under chapter X of the Bankruptcy Act and the order of the U.S. District Court for the Eastern District of Virginia directing consummation of the plan. The court reserved jurisdiction over all assets dealt with by the plan and over all corporations to which such assets were transferred and all parties appearing in the proceedings.

The bankruptcy court had and continues to have jurisdiction over Central States, represented by its trustee, Carl Austrian, which at all times owned 66 percent of the issued and outstanding stock of Ridge Realization, petitioner herein. It also has jurisdiction over petitioner which is a corporation organized and made use of to effectuate the the reorganization plan. The transfer of Blue Ridge's assets to petitioner, solely in exchange for all of its stock, was an integral part of the reorganization plan as is the realization of recovery in the lawsuits and the distribution of the proceeds thereof in accordance with the plan.

### OPINION

The issue in this case, simply stated, is whether the $800,000 received by petitioner in settlement of its lawsuit against Harrison Williams is taxable income. Petitioner contends that the settlement proceeds are not taxable income by reason of the so-called tax benefit doctrine underlying *Dobson* v. *Commissioner*, 320 U.S. 489 (1943), rehearing denied 321 U.S. 231 (1944), and related cases, and by rea-

son of section 111 of the Internal Revenue Code of 1954.[3]  Petitioner also contends that it was a mere conduit charged with collecting on the lawsuits and distributing the proceeds to its shareholders in accordance with the bankruptcy plan, and that therefore it did not realize taxable income when the settlement payment was received.

It is argued that the settlement proceeds represent recoveries of losses incurred during the early 1930's by Blue Ridge which losses had produced no tax benefit in the years they were recognized, and, that, therefore, the recoveries were not to be included in petitioner's 1959 income.

Respondent rejects these arguments and claims that the tax benefit doctrine and section 111 are not applicable where the corporation receiving the recovery (petitioner) is an entirely separate and distinct entity from the corporation which incurred the losses without tax benefit (Blue Ridge).  Respondent asserts that petitioner has even failed to show that Blue Ridge could have excluded the recovery from its income if *it*, instead of petitioner, had received the recovery; respondent claims that petitioner has failed to establish that Blue Ridge did not realize a tax benefit when the losses were taken into income.[4]

We shall first discuss the latter contention of respondent.  Where, as here, $800,000 is paid "in settlement of the claims asserted in the Marco action against the Estate of Harrison Williams," the character of the amount recovered is determined by the nature of the claims actually pressed and settled in the litigation.  *Lyeth* v. *Hoey*, 305 U.S. 188 (1938) ; *Raytheon Production Corporation* v. *Commissioner*, 144 F. 2d 110 (C.A. 1, 1944), affirming 1 T.C. 952 (1943), certiorari denied 323 U.S. 779 (1944) ; *Armstrong Knitting Mills*, 19 B.T.A. 318 (1930).

Respondent contends that the widow of Harrison Williams paid the settlement to obtain the assets of her husband's estate which were tied up because of the Marco litigations.  We reject this contention.  The theory that the nature of the amount received in a lawsuit settlement is governed by the nature of the claims asserted is not under-

---

[3] SEC. 111. RECOVERY OF BAD DEBTS, PRIOR TAXES, AND DELINQUENCY AMOUNTS.

(a) GENERAL RULE.—Gross income does not include income attributable to the recovery during the taxable year of a bad debt, prior tax, or delinquency amount, to the extent of the amount of the recovery exclusion with respect to such debt, tax, or amount.

(b) DEFINITIONS.—For purposes of subsection (a)—

(1) BAD DEBT.—The term "bad debt" means a debt on account of the worthlessness or partial worthlessness of which a deduction was allowed for a prior taxable year.

\* \* \* \* \* \* \*

(4) RECOVERY EXCLUSION.—The term "recovery exclusion", with respect to a bad debt, prior tax, or delinquency amount, means the amount, determined in accordance with regulations prescribed by the Secretary or his delegate, of the deductions or credits allowed, on account of such bad debt, prior tax, or delinquency amount, which did not result in a reduction of the taxpayer's tax under this subtitle \* \* \*

[4] Respondent denies also that petitioner is a mere conduit and contends it could use the proceeds of the recovery for its own business purposes.

mined by the fact that the Countess Bismarck may have been under the impression that the claims in the Marco action were without any merit, and that she may have been impelled to initiate the settlement negotiations only by her desire to induce petitioner to release its claims against her husband's estate and thus make his funds available to her. The facts that her need for the funds stimulated her to settle and that she is said to have believed the Marco action to be baseless no more alter the character of her payment to petitioner than other labels attached to settlement payments or the typical statements by defendants that they do not admit any liability whatever but are set- tling in order to rid themselves of nuisance claims. The taxable char- acter to the recipients of the payments made by such defendants are not altered by virtue of such characterizations. *Albert J. Goldsmith,* 22 T.C. 1137 (1954), acq. 1955–1 C.B. 4; cf., *Margery K. Megargel,* 3 T.C. 238 (1944), acq. 1944 C.B. 19.

Possibly the Countess considered the Marco litigation to have only nuisance value, but the money she paid was paid to eliminate the claim on which the supposed nuisance rested. Hence, whatever her motives in seeking to unblock the distribution of her husband's estate, the pay- ment she made is nonetheless attributable to the substantial claim which was being seriously pressed in the Marco litigation, of which she had to be rid if she were to free her husband's funds. An exami- nation of the nature of that claim must therefore be made to determine the nature of the recovery.

The Marco complaint alleged a conspiracy among officers, direc- tors, and others, including Williams, to divert and use the assets and property of Blue Ridge for their own benefit and profit and to use Blue Ridge as a "dumping ground" for securities owned by them or by other corporations in which they were interested. While the origi- nal complaint in this action referred to many transactions involving violation of fiduciary duty, and in essence stated grounds for recovery almost identical to those of the stockholders' suits involved in *Penn- road Corporation,* 21 T.C. 1087 (1954), affd. 228 F. 2d 329 (C.A. 3, 1955), by the time of the settlement negotiations in the fall of 1958, all but the Conde Nast transaction and the Central States stock trans- action had been eliminated as a result of amendments to the pleadings from the then pending complaint in the revived action. Hence, on the face of the complaint, the plaintiff was confined, in establishing the defendants' wrongdoing, to the two above-mentioned transactions. We have set forth the specific allegations of the complaint with respect to these transactions in our Findings of Fact.

The Conde Nast loss in the amount of $3,653,250, which we have described in detail in our findings, was incurred by Blue Ridge in 1934. Since the loss resulted from actionable wrongdoing, there arose at the time thereof a right of action for recovery, said right of action

(or claim) having a basis equal to the amount of the recoverable loss, or $3,653,250. *Iowa Southern Utilities Co.* v. *United States*, 348 F. 2d 492 (Ct. Cl. 1965). Blue Ridge reported an overall net loss on its 1934 tax return of $3,645,693.74 (including the Conde Nast loss). Hence, $3,645,693.74 of the total bad debt [5] loss was deducted without tax benefit. Accord, *John V. Dobson*, 46 B.T.A. 770, 774 (1942), reversed 133 F. 2d 732 (C.A. 8, 1943), reversed 320 U.S. 489 (1943). The parties have stipulated that no other deduction, credit, exclusion, or allowance has been claimed by or allowed to Blue Ridge or petitioner in any way for any year prior to 1959 on account of the Conde Nast loss. If Blue Ridge had recovered anything on the bad debt subsequent to 1934, it would not have been income unless such recovery exceeded the $3,645,693.74 which had been deducted without tax benefit. In other words, the basis to Blue Ridge of any right to recover on account of the Conde Nast loss deducted as a bad debt remained the amount of the bad debt reduced only by the portion thereof which produced a tax benefit as a result of reducing what would otherwise be taxable income to zero. *Dobson* v. *Commissioner, supra*, at 503; *Carpenter* v. *Commissioner*, 136 F. 2d 51 (C.A. 7, 1943), affirming on other grounds 47 B.T.A. 626 (1942); *Erie County United Bank*, 21 T.C. 636 (1954), acq. 1954–2 C.B. 4. In this case that portion was only $7,556.26, and, therefore, Blue Ridge retained a basis of $3,645,693.74 in any right of recovery based upon the Conde Nast loss.

Despite the fact that no tax advantage was realized from the bad debt to the extent of $3,645,693.74 as far as the 1934 corporate income tax is concerned, respondent apparently argues that thereafter tax advantage was derived from the bad debt chargeoff through the reduction it produced in Blue Ridge's "earnings and profits" account. He contends that Blue Ridge engaged in certain transactions involving its capital structure, including a redemption of preferred stock, which produced tax benefits to its shareholders because its earnings and profits had been reduced from the chargeoffs of the losses here in issue. For example, respondent points out that the reduction of earnings and profits which resulted from the chargeoff of the losses enabled the corporation to gain tax advantage through distribution of tax-free dividends. This, of course, resulted from the general rule, presently embodied in section 316(a)(1) of the 1954 Code, that only distributions out of earnings and profits are taxable as dividends. Because earnings and profits were reduced, Blue Ridge was able to make a distribution to shareholders of amounts in excess of earnings

---

[5] Whether this was technically a bad debt, or whether it fits the provisions of sec 111, is of no moment, since it was a loss the deduction of which gave no tax benefit. As we said in *Birmingham Terminal Co.*, 17 T.C. 1012, 1014 (1951), acq. 1952–1 C.B. 1, even though sec. 22(b)(12), the 1939 Code antecedent of sec. 111, "which was intended to achieve a like result in certain circumstances, is literally not applicable here, * * * it was made plain in *Dobson* v. *Commissioner*, 320 U.S. at 505–506, that the addition of these provisions to the Code did not preclude the application of a similar rule in other comparable cases."

and profits, with the result that the portion which was in excess of earnings and profits was not treated as a dividend for tax purposes.[6]

These arguments proceed on misconception of elementary propositions of tax law. Neither Blue Ridge nor petitioner derived any tax benefits of any sort from the losses in the two above-mentioned transactions by reason of any impact which such transactions may have had on Blue Ridge's earnings and profits. We have been referred to no cases supporting the proposition that a reduction in earnings and profits constitutes a tax benefit which would reduce the unrecovered basis in a bad debt or other loss claim. A reduction in earning and profits does not result in any recovery of capital. The relationship of losses to the later exclusion from income of recoveries on such losses is defined in the tax law by the impact of the losses and recoveries on taxable income, not on earnings and profits. See sec. 111, I.R.C. 1954. The only consideration is whether or not the prior deduction resulted in a *reduction of the tax*. *Corporation of America*, 4 T.C. 566 (1945), acq. 1945 C.B. 2.

Respondent, although not very obviously, at times appears to be making the argument that the Conde Nast transaction was not really a bad debt loss at all, but was really a securities transaction which resulted in a capital loss, for which the allowable deduction is limited in amount, or the loss of profits.

Taking up the lost profits argument first, we fail to see how any amount recovered on account of the Conde Nast transaction represents recovery of lost profits on that transaction. When Blue Ridge acquired the Conde Nast Publications, Inc., stock from the Chase Bank for $4 million and resold it to Conde Nast for his note in the amount of $4,800,000, it realized and reported in its tax return a profit on the transaction of $800,000 less commissions. This was then a closed transaction. The loss which resulted came from the sale by Blue Ridge of the Conde Nast note and the collateral securing it in a later year for an amount far below its face value and cost; this was regarded as a bad debt loss. Although it is true that $800,000 of the Conde Nast note represented profits on the sale for which the note was received, this profit had already been taken into income so that any money received on the note was a return of capital (or the liquidation of an asset).

As to the securities transaction argument, it is alleged that the Conde Nast note was merely a sham with no personal liability and no intention on the part of anyone that it would be paid and that Blue Ridge merely bought and resold the Conde Nast Publications stock, which

---

[6] Respondent apparently alleges certain other tax advantages derived from the reduction of earnings and profits. We need not describe them here in view of our holding, *infra*, that the benefits from reduction of earnings and profits are irrelevant.

purported to be collateral for the note, at a substantial loss. Without determining the real nature of the Conde Nast transaction, the fact remains that it was treated as a bad debt loss by Blue Ridge in its 1934 return and allowed as such, and this treatment was never challenged. We fail to perceive how the question at issue here would be affected even if we were to agree with the position of respondent regarding the nature of the Conde Nast transaction. Respondent may not here recompute Blue Ridge's 1934 income tax. We have held that the major portion of the Conde Nast loss was deducted without tax benefit and to the extent that there was no tax benefit Blue Ridge's basis in the Conde Nast claim was not reduced. It would be completely illogical to hold that Blue Ridge's basis *should be* reduced because the deduction was improperly taken. If it had not been taken at all there would have been no reduction in basis. *Erie County United Bank, supra.*

On the other hand, respondent cannot be contending that because the portion of the deduction which gave rise to a tax benefit was improperly taken the basis should *not* have been reduced since respondent's position seeks a basis as *low* as possible in Blue Ridge's hands. We hold that Blue Ridge retained a basis of $3,645,693.74 in any right of recovery based upon the Conde Nast loss.

The Central States stock transaction resulted in a net loss to Blue Ridge of $1,086,380.71. This loss was attributable to the breach of fiduciary duty of Harrison Williams and other officers in effecting an exchange in which Blue Ridge gave up assets greatly in excess of the value of the Central States stock received. Thus, at the time the loss was realized Blue Ridge acquired a right of action against the wrongdoers with a basis equivalent to the amount of the loss attributable to the wrongdoing. *Iowa Southern Utilities Co.* v. *United States, supra.* The entire net loss of $1,086,380.71 was deducted by Blue Ridge in its tax return with the result that net income from other transactions in the amount of $652,695.75 was wiped out and an overall net loss for the year of $433,684.96 was reported. Hence, there was a tax recoupment of the Central States stock transaction loss in the amount of $652,695.75, and the basis in the retained right of action against Harrison Williams was reduced to $433,684.96, the portion of the net loss on the transaction which remained unrecouped against income. *Dobson* v. *Commissioner, supra* at 503. Any subsequent recovery from the wrongdoing directors would be pursuant to the right of action which arose when the loss occurred and would represent a recovery of the basis therein up to $433,684.96. Any excess would be regarded as gain. *John V. Dobson, supra; Estate of James N. Collins*, 46 B.T.A. 765, 769 (1942), reversed 133 F. 2d 732 (C.A. 8, 1943), reversed 320 U.S. 489 (1943); *Amsco-Wire Products Corporation*, 44 B.T.A.

717 (1941), nonacq. 1941–2 C.B. 15.   The right to recovery on account of the Central States stock transaction therefore still had an unrecovered basis of $433,684.96.

In light of the foregoing, it is clear that the $800,000 recovery, if made by Blue Ridge, would not have been income, but would have been a nontaxable return of capital to that corporation.  Such tax treatment is presently provided in section 111 of the 1954 Code.   Respondent's principal contention, however, is that even if the recovery would have been tax free under section 111 had it been received by Blue Ridge, the recovery was in fact received by petitioner, an entirely distinct and independent entity, and to petitioner the recovery constituted taxable income.

Both parties in the instant case have devoted their briefs almost entirely to the question whether petitioner, a successor corporate entity, may take advantage of section 111 when the loss was incurred by its transferor, a separate and distinct entity, or whether petitioner here should be treated as in effect the same taxpayer as its predecessor, Blue Ridge.   We need not decide the specific question whether section 111 applies in the instant situation, for we have concluded that the recovery was not taxable income even if petitioner is not treated as the same taxpayer as Blue Ridge and even if section 111 is inapplicable.   The recovery was simply a return of petitioner's capital.

Petitioner's capital structure was created by the transfer to it by Blue Ridge of $300,000 cash plus 806,248 shares of Central States stock plus the claims for recovery of damages from Harrison Williams and others, resulting from the Conde Nast and Central States transactions. All of this transpired in accordance with the plan of reorganization under chapter X of the Bankruptcy Act, as outlined in our Findings of Fact.

For these assets, it issued its own stock, and these assets were acquired solely in exchange for such stock.   The shares thus issued were and alway have been the entire outstanding stock of petitioner.   The assets thus acquired by petitioner were capital contributions and constituted the entire capital of the corporation.   Petitioner and respondent are in agreement that the transaction in which the claims were transferred to petitioner by Blue Ridge was a tax-free transaction and that petitioner therefore took a carryover basis in the assets from Blue Ridge.[7] Thus, the basis to petitioner of the assets received from Blue Ridge solely in exchange for all of its stock is the same as the basis of those assets in the hands of Blue Ridge just prior to the transfer.   *Raytheon*

---

[7] Petitioner asserts that this result is produced by either secs. 112(b)(10) and 113(a) (22), 112(b)(5) and 113(a)(8), or 112(g)(1)(D) and 113(a)(7) of the 1939 Code.   Respondent asserts that secs. 112(b)(3), 112(b)(4), and 113(a)(7) are applicable.   Since the parties are agreed that there was a tax-free transaction and that petitioner took a carryover basis, we need not decide under which of the above sections this result was effected.

524

*Production Corporation, supra* at 114; *Hyatt Roller Bearing Co.* v. *United States*, 43 F. 2d 1008, 1020 (Ct. Cl. 1930) ; see *Nevada Oil Co.*, 22 T.C. 630 (1954), acq. 1954–2 C.B. 5; *Central Loan & Investment Co.*, 39 B.T.A. 981 (1939), acq. 1939–2 C.B. 6, withdrawn and nonacquiescence substituted 1940–2 C.B. 10.

Among the assets received by petitioner from Blue Ridge pursuant to the plan and court's order were intangible contingent assets in the form of rights of recovery for certain losses incurred by Blue Ridge in 1929 and 1934, caused by the wrongdoing of various persons. These rights of action constituted a part of the original capital of petitioner and, therefore, any recovery arising from these rights constitutes a return of capital. *Doyle* v. *Mitchell Brothers Co.*, 247 U.S. 179 (1918) ; *Hyatt Roller Bearing Co.* v. *United States, supra; Nevada Oil Co., supra;* cf. G.C.M. 9210, X–1 C.B. 129 (1931).

In *Hyatt Roller Bearing Co.* v. *United States, supra,* one of the corporate taxpayers issued its own stock in exchange for a certain patent and all rights to damages for infringement of the patent prior to its acquisition. Subsequently, taxpayer received over $1 million in settlement of the infringement claim. The court rejected the Commissioner's attempt to tax the settlement proceeds as income, stating (p. 1020) :

The [taxpayer] Corporation purchased the right to whatever damages might be recovered for infringement of the patent for stock and to that extent the matter was therefore a capital transaction. The subsequent receipt by the corporation of a check from the Standard Parts Company was nothing more than the conversion of this asset, and no taxable income was received.

The cases of *First National Bank in Houston* v. *Scofield*, 201 F. 2d 219 (C.A. 5, 1953), affirming 106 F. Supp. 300 (S.D. Tex. 1952) ; *Rice Drug Co.* v. *Commissioner*, 175 F. 2d 681 (C.A. 3, 1949), affirming 10 T.C. 642 (1948) ; *Michael Carpenter Co.*, 47 B.T.A. 626 (1942), acq. 1942–2 C.B. 3, affd. 136 F. 2d 51 (C.A. 7, 1943) ; and *National Bank of Commerce of Seattle*, 40 B.T.A. 72 (1939), affd. 115 F. 2d 875 (C.A. 9, 1940), relied upon by respondent, are all distinguishable from the instant case. In each of those cases the court regarded the successor corporation which realized the recovery as having a zero basis in the claims which were realized on. Such is not the case here. Petitioner here has a basis in its claims equivalent to Blue Ridge's basis therein. As discussed above, Blue Ridge had a basis of $3,645,693.74 in the rights arising out of the Conde Nast loss and a basis of $433,684.96 in those arising out of the Central States transaction loss, or a total basis of $4,079,378.70 in the claims underlying the Marco action. The 1959 settlement with the Williams Estate involved only $800,000, an amount which comes nowhere near exhausting the petitioner's basis in its

claims. Hence, these settlement proceeds, in their entirety, are clearly a recovery of basis or return of capital to petitioner.

The case of *Erie County United Bank, supra,* relied upon by petitioner, is directly in point here. In that case, there was a consolidation of two banks, and subsequently the consolidated bank recovered on certain accounts which had been written off as bad debts (but not deducted for tax purposes) by the consolidating banks prior to the consolidation. After first pointing out that recovery of a debt is normally not income except where the basis of the debt is zero to the taxpayer, we held that the consolidation transaction was a reorganization under which the basis of the old banks' assets were carried over to the new corporation. Hence, the new corporation did not realize income when it collected on these accounts since the accounts had a carryover basis equivalent to their original book value. It was pointed out that the amounts recovered were not deducted for tax purposes except for a small amount deducted in 1 year and that therefore the problems of tax benefit and recovery exclusions were not involved except as to that small deducted amount. It was then noted that *National Bank of Commerce of Seattle,* 40 B.T.A. 72, and 12 T.C. 717, were not in point. We went on to explain in *Erie* that as to the small amount charged off, deducted and allowed in an earlier year for income tax purposes, recovery thereof constituted income in the year of receipt because the debts were without any basis in the hands of the *predecessor* bank. The basis of these small debts was therefore zero in the hands of the transferee corporation. Here, as we have detailed, the basis of the claims underlying the recovery by petitioner from Countess Bismarck was in excess of $4 million in the hands of Blue Ridge, the *predecessor* corporation, and therefore the lawsuit seeking recovery on those claims does not have a zero basis in petitioner's hands. Taxable income is not realized when recovery of the claim is made until the carryover basis is exhausted.

Respondent takes the position that petitioner's carryover basis in the claims was zero since the claims had a zero basis to Blue Ridge at the time of their transfer. It is assumed that, because the losses which gave rise to the claims had been deducted in full in the years they were incurred, the basis in the claims must then have been reduced to zero. We think respondent is incorrect in this position; in such a situation a workable result is possible only if the reduction of basis is limited to the extent of the tax benefit resulting from the deduction of the loss. The latter approach was approved by the Supreme Court in *Dobson* v. *Commissioner, supra* at 503.

In *Erie County United Bank, supra,* we held that there was no reduction in basis of the bad accounts because, although they had been written off in the bank's books, they had not been deducted in the tax

return. Would the result have been different if the bank, merely for the sake of keeping the tax records consistent with the regular books of account, had included these bad debts in its tax return without thereby affecting the taxable income? We think not, yet respondent's analysis would require such a different result. To the extent that respondent's approach is supported by *Merchants National Bank* v. *United States*, an unreported case (D. Kans. 1956, 52 A.F.T.R. 1600, 1603, 57–1 U.S.T.C. par. 9380), we decline to follow that case.

The parties have devoted portions of their briefs to argument concerning an appropriate allocation of the $800,000 total recovery between the Conde Nast claim and the Central States stock transaction claim. Although the total recovery is far below petitioner's combined basis in the two claims ($4,079,378.70), it is far greater than the $433,684.96 basis in the Central States stock transaction claim viewed separately. Hence, if the entire $800,000 recovery (or any portion thereof greater than $433,684.96) were to be allocated to the Central States transaction claim, the basis in that claim would be exhausted and a taxable gain would result.

This Court has expressly ruled in a case similar to the instant one involving settlement proceeds from a stockholder's derivative lawsuit which embodied several underlying claims, that an allocation of the recovery among the various claims was unwarranted. *Pennroad Corporation, supra.* In that case we stated (p. 1098):

We think that respondent's insistence on treating each investment complained of as a separate claim to which a portion of the settlement must be allocated is unwarranted. The several transactions were actually nothing more than steps in the carrying out of Pennsylvania's plan to create and use petitioner as a vehicle for its own purposes * * * The basic nature of the claim lay in losses arising from a series of Pennsylvania's acts in furtherance of a continuing conspiracy.

Even if the *Pennroad* case may be said to be distinguishable and not controlling here, which we think is an unwarranted view, so that an allocation is to be made, the record herein simply does not support an allocation to the Central States transaction claim large enough to exhaust petitioner's basis therein and produce a taxable gain.

It is clear from the record that at all times, at least since 1945, Blue Ridge and petitioner regarded the Marco complaint as based essentially on the Conde Nast transaction. Such was the advice given to the original trustees of Central States after extensive inquiry by counsel and accountants in 1944 and 1945. Nothing beyond the Conde Nast transaction was ever found as an additional ground for complaint by the first counsel retained to represent Blue Ridge in the Marco action. Subsequent investigation by the present counsel for petitioner in that litigation confirmed the conclusion that the only

substantial claim to be asserted in the Marco litigation was that with respect to the Conde Nast transaction. Compare *Larchfield Corporation* v. *United States*, 243 F. Supp. 926 (D. Conn. 1965).

Petitioner's view of the relative merits of the claims was not unknown to Countess Bismarck and defendants' counsel even before the settlement negotiations, in view of the dismissal of the complaint in the direct action against Williams in 1957 and the acknowledgement implicit therein, of fundamental weaknesses in the claim based on the Central States stock transaction. Hence, the settlement negotiations were opened in a framework within which only the Conde Nast transaction could be urged as the serious basis for the liability of the directors of Blue Ridge. But it is not merely a matter of inference that the Countess' counsel knew that the Harrison Williams' exposure rested almost entirely on the Conde Nast transaction. In the settlement negotiations, the only claim pressed or discussed by the parties was this transaction. If Harrison Williams' estate was exposed to any liability, it was made plain that its vulnerability was for his actions as a director in conspiring with the other directors to authorize the Conde Nast transaction.

Accordingly, from the point of view of the parties negotiating the settlement, virtually the entire recovery rests on the exposure of Harrison Williams' Estate to liability by reason of the Conde Nast affair. The president of petitioner, who conducted the settlement negotiations, indicated that while it was impossible to set any precise figure as to the relative values of the two remaining claims in settling the litigation, in his judgment 95 percent of the value of the Marco action was attributable to the Conde Nast loss and only 5 percent to the Central States stock transaction loss. If an allocation were to be made, the evidence before us would support such a 95- to 5-percent division. However, we do not deem it necessary to make a specific percentage or dollar allocation of the recovery. Suffice it to say for purposes of this case, that in any event the portion of the recovery attributable to the Central States stock transaction claim was not in excess of $433,684.96, petitioner's basis in that claim. Hence, the entire $800,000 recovery received by petitioner in 1959 for release of its claims against the Estate of Harrison Williams was a return of capital to petitioner and was not income. *Pennroad Corporation, supra; Erie County United Bank, supra.*

Other arguments advanced by both parties have been carefully considered but need not be decided in the light of our disposition of the case.

*Decision will be entered for the petitioner.*