**Lucille HOWARD, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REV-ENUE, Respondent-Appellee.**

**No. 30475.**

United States Court of Appeals, Fifth Circuit.

May 21, 1971.

Robert O. Rogers, Palm Beach, Fla., for petitioner-appellant.

Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Bennett N. Hollanders, and William K. Hogan, Attys., Tax Division, U. S. Dept. of Justice, Martin K. Worthy, Chief Counsel, Daniel J. Boyer, Internal Revenue Service, Washington, D. C., for respondent-appellee.

1. See NLRB v. Amalgamated Clothing Workers of America, 5 Cir., 1970, 430 F.2d 966.

Before WISDOM, Circuit Judge DA-VIS *, Judge, and GOLDBERG, Circuit Judge.

WISDOM, Circuit Judge.

This case involves the application of Lyeth v. Hoey, 1938, 305 U.S. 188, 59 S.Ct. 155, 83 L.Ed. 119, and its progeny. The question is whether money received by the taxpayer in a compromise settlement in return for joining in a sale of real estate by her one-time husband is to be treated as payment for dower rights, and thus not taxable, or whether it is to be treated as ordinary income.

In May 1942 Lucille Howard, the taxpayer, married Vince Nelson, a resident of Jupiter, Palm Beach County, Florida. In October 1943 Nelson, then on active duty in the Military Service, filed suit for divorce in Martin County, Florida. He alleged her address to be c/o The 19th Hole, Lake Park, Palm Beach County, Florida. Palm Beach County adjoins Martin County on the south. The Sheriff of Palm Beach personally served Lucille. In her answer in this action, filed in January 1944, the taxpayer admitted that her address as alleged was correct. However, when called as a witness in the May 1969 Tax Court hearing she testified that her permanent place of residence was Juna Plantation, Juno, Palm Beach County, Florida. The parties dismissed the 1943 Martin County divorce proceedings before the court took any action.

Barely two months later, Nelson instituted suit for divorce in St. Lucie County, Florida. St. Lucie County adjoins Martin County on the north. At this time Nelson was in the Army. Rather than seeking personal service, Nelson alleged that after diligent search and inquiry he was unable to discover Lucille's place of residence. Therefore he sought service by mail to Lucille's birthplace in Lockport, New York, and by publication in St. Lucie County. Lucille, who still resided in Palm Beach County, Florida, received no actual notice of the proceedings. On her default, the court awarded Nelson a divorce September 22, 1944.

Lucille received her first notice of the divorce by a form sent to her by the Army notifying her that her family allotment had been discontinued. This notice was addressed to her in Jupiter, Palm Beach County, Florida. She testified that she actually received the notice at the Lake Port, Florida, post office. The reason stated on the form for termination of the allotment was "Soldier Divorced." Lucille thereupon went to the Army camp in an attempt to obtain information about the divorce. She could obtain no information there, but she testified that she believed that the Army would not have discontinued her allotment unless it had investigated the matter and determined that the divorce was valid. From this point on the taxpayer and Nelson travelled different paths for twenty years.

In November 1947 Lucille married Edgar Charles Kingsbury in Folkston, Georgia. Two years later they were divorced. Later, she lived with a Mr. Howard and became pregnant. Howard, an attorney, advised Lucille that they could not marry because she was still married to Nelson. Lucille consulted several attorneys to obtain an opinion on this issue. They advised her that it would be necessary to conduct an extensive investigation since she did not know where the divorce had been granted. Not having the funds to pursue such an investigation, Lucille did nothing further.

On his own path Nelson, who never remarried, acquired several large tracts of land in Florida, some of which was mortgaged. In 1964 Nelson entered into a contract to sell a portion of his property to Bessemer Properties, Inc., for $322,-350 in order to settle his debts and to avoid a forced sale of all his property.

At this point the former spouses' paths recrossed. R. C. Alley, the attorney for the purchaser of the property, learned

---

* Honorable Oscar H. Davis, United States Court of Claims, sitting by designation.

that Nelson had been married and examined the divorce proceedings. He concluded that there was a strong possibility that Nelson's divorce was invalid because the service by publication instead of personal service appeared to have resulted from fraudulent statements by Nelson.[1] Bessemer then requested a re-

1. In his deposition, which was admitted into evidence in the Tax Court, Mr. Alley made the following statements.

At the time the contract was signed, I asked Mr. Nelson whether he was married and he advised that he was not, that he had been married but had been divorced. I asked him where the divorce had been obtained and he told me it had been obtained in Ft. Pierce, Florida.

I thought that was a little peculiar, being up in Ft. Pierce when he was known to be around Jupiter all the time, so I went to Ft. Pierce and found that there had been divorce proceedings begun in St. Lucie County by Nelson against his wife. Lucille Gee Howard is now the name, but it was Lucille Nelson.

I examined the file and found that process against Mrs. Nelson had been obtained by publication and not by personal service. The affidavit or the allegations of the complaint were to the effect that she had deserted him and he had made a diligent search for her and had been unable to locate her, but to the best of his knowledge (6) her then address was in a small town in New York, Lockport, or something like that. In the file was an envelope which the clerk had mailed to her at that address and which had been returned unclaimed.

There was an affidavit of publication showing that publication had been made at Ft. Pierce.

One of the elements of constructive service—that is service by publication —is that not only is there a possibility of the party being served seeing the notice but also her friends and acquaintances, they see it and notify her of the publication. Of course, that would have been completely impossible with the publication being clear up at Ft. Pierce when their previous domicile had been in the neighborhood of Jupiter.

I decided we had better find out more about the allegations of being unable to find out where she was. There is a long series of cases in Florida to the effect that even though there is an allegation of diligent attempt to locate the party, if it appears that any sort of diligent search would have found the location of the party the service by publication is void. I don't recall the citations of those various (7) cases, but there are a great many of them, not only in divorce cases but in other kinds of proceedings.

My next step in investigating the divorce was to go to the Jupiter area where I was sure people would have known about Vincent and his wife. Of course, the reason I was doing all this, if she was still married to Nelson, if there hadn't been a valid divorce, any title we obtained from him—I say "we," meaning Bessemer Properties—would have been a poor title because of the lack of elimination of the inchoate right of dower.

I went to Jupiter and made an investigation there, talking with various people, and it was generally known there that Nelson and his wife had separated sometime before but that she had remained in the vicinity right along and had recently gone down to Lake Park, but was nearby.

Another feature that led me to making this investigation was the fact that the only witness that Nelson had was an associate of his in the military service located at Camp Murphy. In a divorce suit in which desertion was alleged, and (8) everybody in Jupiter knew Vince Nelson, or I imagine just about everybody, from the age of four on up. It seemed very peculiar to me that he hadn't had some witnesses from there.

So I reached the conclusion that the divorce was for lack of jurisdiction of the court. It would have been very simple for the wife to have it set aside.

After this first investigation, I learned—I don't recall just how—that not very long before the proceedings were filed in Ft. Pierce, Vince Nelson had brought divorce proceedings against her at Stuart in Martin County and that those proceedings had been dismissed. I did not examine that file. I just learned they had been dismissed.

Q Did you learn that she was represented by counsel in Martin County?
A Yes, I did, also that Ted Oughterson, who is a very respectable attorney, had represented Nelson and had joined in a dismissal of the case. The case had been dropped.
Q Mr. Alley, was it your conclusion as a result of your investigation that there was a potential justiciable controversy

lease of dower as a condition of closing the sale.

When Lucille was asked to sign a release of dower, she agreed to join in the deed of sale in return for $30,000 cash and real estate worth $10,000. The agreement was carried out by all parties. Bessemer paid the $322,350 in return for the lots deeded by Nelson and Lucille. She received the agreed upon value. And Nelson, after paying off his indebtedness retained a net of about $63,000. He died in 1968 and his testimony was not available at the Tax Court hearing.

Lucille did not include the $40,000 in her income for 1965. The Commissioner of Internal Revenue determined a deficiency in her income tax on the ground that the amount should have been included in her income. Lucille petitioned the Tax Court for a redetermination of the deficiency. The Tax Court upheld the position of the Commissioner and Lucille Howard appealed to this Court.

The Tax Court based its decision on alternative reasoning. 54 T.C. 855 (1970). First, it concluded that Lucille had no dower rights under Florida law because there was no fraud and because she waited so long to raise the issue of her rights. Second, it held that even if Lyeth v. Hoey applies to this case there was no bona fide compromise because there was no color of merit to Lucille's claim, no litigation was threatened, and the only reason that Nelson agreed to pay her $40,000 was that he was forced by the threat of a mortgage foreclosure to sell his property quickly.

We reverse.

## I

The Tax Court concluded, first, that the proceeds were taxable to Lucille because as a matter of state law she had

no dower rights to release. The court found her claim for a redetermination without merit because, she "has not established to our satisfaction that she would be successful in her contention that she was the wife of Nelson in April 1965 under Florida law." In relying on a finding as to whether Lucille had a *successful* claim for dower under Florida law, the Tax Court necessarily rejected the applicability of Lyeth v. Hoey.

In Lyeth v. Hoey, heirs attacked the decedent's will, which gave the bulk of her estate to a trust for religious purposes, on the ground of the decedent's testamentary capacity. If the will had been voided by the courts, the heirs would have taken the entire estate by intestacy. The heirs and those named in the will reached a compromise. The Commissioner of Internal Revenue asserted that the proceeds received by the heirs was not within the exception from income for proceeds received by bequest. The Court ruled that the proceeds were not taxable as income to the heirs because they did fall within this exception. The Court said

> Petitioner was concededly an heir of his grandmother under the Massachusetts statute. * * *

> There is no question that petitioner obtained that portion, upon the value of which he is sought to be taxed, because of his standing as an heir and of his claim in that capacity.

305 U.S. at 195–196, 59 S.Ct. at 159, 83 L.Ed. 125.

■ The Tax Court and the Commissioner on appeal find *Lyeth* inapplicable because there the taxpayers' standing as heirs was not challenged while here petitioner's status as wife has been contested. With deference, we think that such reasoning misses the point of *Lyeth*. In *Lyeth* the Court established the doctrine

as to the validity of (9) the divorce?
A  I would almost make it stronger than that. I thought it was a cinch.
Q  What was a cinch, sir?
A  A cinch that the divorce could be set aside, that there wasn't any jurisdic-

tion in the court to enter a decree, and that therefore she was still his wife. It certainly was justiciable but it was, I would say, a foregoing conclusion that that could have been accomplished.

that in tax matters the characterization of proceeds received in compromise should be determined according to the nature of the claims in settlement of which the proceeds were received. It is artificial to say that any particular aspect of the basis for the claim (e. g. status) must be conceded. Thus in Ridge Realization Corp. v. C.I.R., 1966, 45 T.C. 508 what was compromised was a claim by stockholders against former corporate officers alleging wrongful injury to the corporation. There was no talismanic "status" involved in that case, yet the Tax Court held that the rule of Lyeth v. Hoey applied so that "the character of the amount recovered is determined by the nature of the claims actually pressed and settled in the litigation." *See* Raytheon Production Corp. v. C.I.R., 1 Cir. 1944, 144 F.2d 110.

We conclude that this case is controlled by Lyeth v. Hoey and its progeny. The question that determines whether the proceeds received by Lucille are to be treated for tax purposes as property received for release of dower rights is not whether in fact Florida would recognize dower rights in Lucille but rather whether there was a good faith compromise concerning her claim to dower rights.

## II

The next question is whether the Tax Court erred in holding that there was no bona fide compromise of claims regarding dower rights. The court came to this conclusion after determining that there was no color of merit to Lucille's claim, that no litigation was threatened in support of the claim, and that Lucille received payment only because Nelson was in financial distress and had no time to pursue any other course of action.

We think the Tax Court erred in two respects: (a) there was color of merit to Lucille's claim; and (b) the proper standard for judging the bona fides of a compromise for tax purposes is not whether the court might decide that the claim is meritorious but whether the taxpayer in good faith thinks that the claim is meritorious.

■ As to the merit of the claim, there were two issues as to the validity of Lucille's claim. The first was whether Nelson had obtained the divorce by fraud. This was a question of fact. The parties did not dispute the applicable law; they disputed whether Nelson had obtained constructive service in the good faith belief that Lucille could not be found or whether he committed perjury and fraud in seeking constructive service. This was a live issue. Considering the fact that Nelson just two months previously, after negotiations with an attorney hired by Lucille, had dismissed a divorce suit it was reasonable that Alley, the purchaser's attorney, should conclude that Nelson had acted fraudulently and that the divorce was invalid because of lack of service. The Tax Court's finding that there was no fraud does not speak to the point whether there was a legitimate dispute over the issue.

The second issue is whether Lucille was barred from attacking the divorce decree by laches. The trial court cited several Florida cases to show that, even were the divorce decree originally procured by fraud, a delay of twenty years would bar Lucille from litigating. Those cases do not establish that her claim had no color of merit. The two cited cases most closely related to the instant case do not conclusively establish whether laches would bar Lucille's claim. In both cases the courts found laches because the party seeking to upset the divorce had unreasonably delayed litigating the issue, *in the interim innocent third parties had relied on the divorce decree,* and allowing a late challenge to the validity of the divorce would unfairly injure these third parties. Thus in Carpenter v. Carpenter, S.D.Fla.1950, 93 F.Supp. 225, the court held that the first wife could not contest the validity of the divorce because she delayed contesting it despite her knowledge that the former husband had later married, and the successor spouse had relied on the validity of the divorce decree. In Johnson v. Hayes, Fla.1951, 52 So.2d

109, the wife waited until after the deceased ex-husband's estate was closed to seek dower rights in real property that he had sold to bona fide purchasers. The court held that since it was too late for these third parties to seek reimbursement from the husband's estate, the claim by the wife was barred by laches.

The doctrine of laches requires not only an unreasonable delay but also that the delay result in injury. In this case it appears that no injury was caused by the delay in asserting the claim. No other parties have relied on the divorce decree to their detriment. Additionally, a court of equity might consider as decisive Lucille's ignorance of the law and her financial inability to pursue the matter in determining whether she was barred by laches.

We are not suggesting that a court of equity would necessarily find Lucille's claim not to be barred by laches. We hold simply that, since equity courts do justice by applying very general maxims to particular facts in each case, it is difficult if not impossible to be certain what the outcome of litigation would be in this case. Lucille's claim cannot be said to be wholly without merit.

■ Moreover, we are of the view that the tax character of the proceeds received under a compromise of a claim should not necessarily be determined by the strength of the merits of the party's claim. Rather, it should be determined on the basis of the party's good faith belief as to the merits.

The decided cases do not stand for the government's position. Several related cases do discuss the merits of the applicable law and find that there was no substantial question as to the legal rights of the parties. But the opinions make clear that the lack of merit of the claims was not conclusive, but rather evidence supporting some inference about the true intentions of the parties. In Grossman v. Campbell, 5 Cir. 1966, 368 F.2d 206, this Court looked to the law of Texas to determine whether there could have been a bona fide dispute over the validity of a will. In light of the clear rights under state law, the court concluded that "it stretche[d] credibility to ask this Court to believe that anyone really thought that the holographic will could have prevented the later codicil and the [contested] written 1949 will from being probated . . . ."

Also in Housman v. Commissioner of Internal Revenue, 2 Cir. 1939, 105 F.2d 973, the court looked to the clear rights of the parties in finding that a threatened contest of a will was not the real reason that the taxpayer, a widow, agreed to increase her annual donations to her son. The court said "The son's threats * * * could not have caused serious alarm to the petitioner. * * * [W]e are not impressed by the petitioner's argument that the parties were hostile, were dealing at arm's length, and were compromising a bona fide will contest. The more reasonable inference is that the petitioner's expression of a willingness to pay $100,000 a year, with annual birthday and Christmas presents in addition, was motivated by the kinship between the payor and the receiver. It was essentially donative in character, a promise or agreement to make gifts in the future." 105 F.2d at 975.

Typically in cases involving compromises where the courts find the agreements made in good faith as a result of arm's length bargaining, this conclusion is based on various evidence of the seriousness of the dispute. Rarely does the court investigate the merits of the dispute to determine whether it is a close case or whether it is even arguable in fact. Thus in Ridge Realization Corp. v. Commissioner, 1966, 45 T.C. 508, the court found a compromise valid because there was a "substantial claim that was being seriously pressed". And in Estate of Sedgwick Minot v. Commissioner, 1966, 45 T.C. 578, the court relied on the fact that the party's counsel considered the claims as "serious threats with substantial basis in fact and law." 45 T.C. at 584.

The question of the standard for determining the validity of compromises

arises in other areas of the law. For instance, the question arises in contract law whether a forbearance to press a meritless claim is sufficient consideration if the party believes in good faith that the claim is meritorious. The Tentative Draft No. 2 of the Restatement Second of Contracts (1965) favors a standard based on subjective good faith. The black letter of § 76B makes the surrender of an invalid claim sufficient consideration where "the forbearing or surrendering party honestly believes that his claim or defense is just and may be determined to be valid." The comments to the section restate the point: "Even though the invalidity should have been clear at the time the settlement of an honest dispute is upheld."

■ There are strong policy reasons for taking at face value compromises based on claims made in good faith. As Corbin says:

> The main reason for sustaining such a compromise agreement is one of social policy. The peaceful settlement of disputes without litigation (or war) is in the interest of the community. It is not the less so even though one of the parties may have been in the right, or more nearly so than the other. It is not often, if ever, that subsequent events clearly demonstrate the "merits" of the dispute. There are "two sides" to most disputes. Even if the dispute had been submitted to "wager of battle" or to "trial by ordeal," or to "wager of law," or to a modern court and jury, the dispute may be finally adjudicated; but we know well enough that the solution may have serious flaws. In any case, the voluntary compromise may be equally just; and how much less expensive and troublesome to the parties and to the community!

Corbin on Contracts § 620 (1960).

Such considerations have a proper bearing on the tax treatment of proceeds received under compromises. Two factors stand out. First, compromises may reach just results even though a party would not win in court. And second, reliance on good faith avoids the necessity for federal courts to determine sometimes-complex issues of state law, where on occasion they may err in determining what a state court would do.

Having concluded that the standard for judging compromises should be the good faith of the parties, it remains to determine whether Lucille Howard asserted her claim to compensation for her dower rights in good faith. As we read the record, she did. The validity of the divorce was first raised by Alley, the attorney for Bessemer, the purchaser of Nelson's land. He was acting in the interest of his client in having a clear title. Though he may have been mistaken, the objectivity of his determination that Lucille Howard should participate in the conveyance cannot be questioned. His action strongly suggested that Lucille was in good faith. Others approached her and sought her participation in the conveyance. The obvious implication is that the purchaser was concerned about her rights. That she threatened no litigation does not affect the good faith of her claim: She did not have to do so in the factual context of this case. It was the lawyer for the purchaser who made a substantial issue of her dower rights.

■ Arguing further that the compromise recognized not a good faith claim but simply a "naked threat", the government asserts that the only reason that Nelson agreed to pay Lucille was that he was in financial distress and had no time to pursue any other course of action. That this may have been his motivation does not undercut the validity of the compromise. In response to a similar contention by the government in Ridge Realization Corporation v. Commissioner, 1966, 45 T.C. 508, the court said:

> The theory that the nature of the amount received in a lawsuit settlement is governed by the nature of the claims asserted is not undermined by the fact that the Countess Bismarck may have been under the impression that the claims in the Marco action were without merit, and that she may have been impelled to initiate the settlement negotiations only by her de-

sire to induce petitioner to release its claims against her husband's estate and thus make his funds available to her. The facts that her need for the funds stimulated her to settle and that she is said to have believed the Marco action to be baseless no more alter the character of her payment to petitioner than other labels attached to settlement payments or the typical statements by defendants that they do not admit any liability whatever but are settling in order to rid themselves of nuisance claims.

*Id.* at 519. The language in Bailey v. Ratterre, N.D.N.Y.1956, 144 F.Supp. 449, that a claim must be more than "a naked threat" refers, we think, not to the view of the obligor but rather to the view of the claimant. If he makes his claim as a naked threat, then the tax character of the proceeds should not be determined according to the nature of the claim.

We hold that in the circumstances of this case the proceeds Lucille Howard received from the compromise should be treated as a substitution for dower rights and that they are not taxable as income. The judgment of the Tax Court is reversed.