Michael A. **MAYBERRY** and Patricia J. **Mayberry, Plaintiffs,**

v.

**UNITED STATES** of America, **Defendant.**

No. 4:95 CV 2463 DDN.

United States District Court,
E.D. Missouri,
Eastern Division.

Sept. 11, 1997.

S. Sheldon Weinhaus, Weinhaus and Dobson, St. Louis, MO, Stephen L. Hester, Washington, DC, for Plaintiffs.

Wesley D. Wedemeyer, Office of U.S. Atty., St. Louis, MO, Noreene C. Stehlik, U.S. Dept. of Justice, Office of Special Litigation, Washington, DC, for Defendant.

## OPINION

NOCE, United States Magistrate Judge.

This action is before the Court upon the cross-motions of the parties for summary judgment under Federal Rule of Civil Procedure 56. The parties have consented to the exercise of authority by a United States Magistrate Judge under 28 U.S.C. § 636(c). A hearing was held on the motions on February 6, 1997.

Plaintiffs Michael A. Mayberry and Patricia J. Mayberry[1] have brought this action for the refund of income taxes and employment taxes which they paid on amounts received by Mr. Mayberry in the settlement of a class action lawsuit (the *McLendon/Gavalik* cases).[2] In an effort to reduce its pension liabilities, Continental Can Company, Inc., wrongfully discharged plaintiff and thousands of other employees who are members of the combined litigation class. To settle the subsequent claims for damages, Continental Can created a $415 million settlement fund from which awards were paid to terminated employees. Although this particular case involves the tax liability of only one class member, the Internal Revenue Service has stated its intention to treat the instant case as one of six "test cases" for determining the proper tax treatment of the distributions to approximately five thousand class members from the $415 million settlement fund.

In this motion, plaintiffs contend that the amounts plaintiff Mayberry received from

---

**1.** Patricia J. Mayberry is a party plaintiff only because she is the wife of plaintiff Michael A. Mayberry and she filed a joint federal income tax return with him for the tax year 1992 which is the subject matter of this action. Hereinafter, references to "plaintiff" refer only to Michael Mayberry.

**2.** *McLendon v. Continental Group, Inc.,* 749 F.Supp. 582 (D.N.J.1989), *aff'd sub. nom.*

*McLendon v. Continental Can Co.,* 908 F.2d 1171 (3d Cir.1990); *Gavalik v. Continental Can Co.,* 812 F.2d 834(3d Cir.1987), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987). *McLendon* and *Gavalik* were instituted as separate actions in different federal district courts. *Gavalik* was transferred to the District of New Jersey where it was consolidated with the pending *McLendon* action.

the settlement fund constitute personal injury damages and are excluded from income and taxation under the Internal Revenue Code (IRC) § 104(a)(2).[3] Generally stated, the position of the defendant United States is that the settlement distributions are not excludable from taxable income as damages received on account of a personal injury and are wages subject to federal employment taxes.

This Court must grant summary judgment if the record demonstrates that there is no genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Board of Educ., Island Trees Union Free School Dist. No. 26 v. Pico*, 457 U.S. 853, 863, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982). The parties agree that the relevant facts are without dispute and have provided the Court a written factual stipulation. From the record of this action, including the Stipulation of Facts and Joint Exhibits filed by the parties, the Court has determined that the relevant facts are undisputed.

The plaintiffs in this tax refund action, Michael A. and Patricia J. Mayberry, are husband and wife residing in this judicial district. Michael Mayberry was employed by Continental Can Company from September 1970 to October 29, 1976, when he was laid off by that company.[4] At that time he was married and had one child. Following his layoff, he felt a great deal of financial insecurity and was fearful that he would be unable to provide properly for his family. After three and a half months of unemployment, he found work with Crown Cork & Seal Company. However, in September 1977 he became employed by the U.S. Postal Service. His compensation by the Postal Service was greater than what he had earned at Continental Can before his discharge. The work with the Postal Service, however, was more stressful and physically demanding than his job at Continental Can. In his written affidavit, Mayberry has described how his quality of life suffered as a result of Continental Can's laying him off, *i.e.* he suffered substantial stress, humiliation, and emotional pain, in spite of the fact that his earnings increased following his layoff by Continental Can.[5] As a consequence of the layoff by Continental Can, Mayberry suffered very little earnings loss.

Mayberry became a member of the class of former Continental Can employees which brought claims under § 510 of ERISA, 29 U.S.C. § 1140,[6] to challenge the legality of Continental Can's program that resulted in

3. Unless otherwise noted, subsequent references to the Internal Revenue Code will be to "IRC § _____." IRC § 104(a)(2) was recently amended, effective generally for amounts received after August 20, 1996. This amendment limits the personal injury exclusion to damages for physical injuries. Because the amendment is not effective with respect to the 1992 payments at issue in this case, all references to IRC § 104(a)(2) refer to the version in effect for payments made and received in 1992. Any payments to class members after August 20, 1996, are not at issue in this action. Such payments are covered by pre-amendment law, as received "under a written binding agreement ... in effect on September 13, 1995." *See* Small Business Job Protection Act of 1996, Pub.L. No. 104–188 § 1605(d), ___ Stat. ___ (August 20, 1996).

4. The facts concerning Mayberry's career with Continental Can Company and the events following his "layoff" are set forth in his affidavit, submitted as Joint Exhibit J to the parties' Stipulation of Facts and Joint Exhibits, filed November 1, 1996. The facts set forth in the affidavit are not disputed by the United States.

5. See Stipulation of Facts and Joint Exhibits, filed November 1, 1996, Joint Exhibit K (statement from the Social Security Administration showing the earnings credited to the Social Security record of plaintiff Michael A. Mayberry for the years 1975 through 1988); *id.*, Joint Exhibit L (Mayberry's earnings from the Postal Service for the years 1977 through 1982).

N.B. Further references to "Joint Exhibit" are references to the exhibits filed with the Stipulation of Facts and Joint Exhibits on November 1, 1996.

6. ERISA § 510 provides that:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ....

the termination of the plaintiff employees. In those actions plaintiffs alleged that Continental Can violated ERISA § 510 by pursuing an illegal scheme to avoid pension benefits liability. *See Gavalik v. Continental Can Co.,* 812 F.2d 834, 838 (3rd Cir.1987), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987); *McLendon v. Continental Group, Inc.,* 749 F.Supp. 582, 583 (D.N.J. 1989), *aff'd sub nom., McLendon v. Continental Can Co.,* 908 F.2d 1171 (3rd Cir.1990). The district court described the program as "a complex, secret and deliberate scheme to deny its workers bargained-for pension benefits...." *McLendon,* 749 F.Supp. at 584. The court determined that Continental Can was liable under ERISA. *Id.* The determination of liability was affirmed on appeal. *See McLendon v. Continental Can Co.,* 908 F.2d 1171 (3rd Cir.1990); *Gavalik v. Continental Can Co.,* 812 F.2d 834 (3rd Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987).

The court of appeals explained the basis of liability as follows:

> We emphasize our holding that Continental's liability avoidance scheme constituted a violation of ERISA when, pursuant to that scheme, individual class members— whether currently at work or already on layoff status—were designated as permanently laid off for the purpose of defeating their pension eligibility. Upon such designation, each class member was entitled to some relief from the illegal scheme. At what point and in what amount actual damages, if any, began to accrue as to any particular class member, however, will be a determination to be made in the proceedings upon remand.

*Gavalik,* 812 F.2d at 865–66.

Following the affirmance of the determination of liability, the district court appointed a Special Master for the specific purpose of assisting the parties in the settlement of the remaining issues in this matter and to expedite a determination of the amounts due to class members and the prompt payment of those amounts; or, absent a settlement, recommending a procedure to expedite the determination of those remaining issues and claims.

*McLendon,* 749 F.Supp. at 612; Joint Exhibit D.

Thereafter, the special master conducted hearings and heard evidence of

> lives deeply affected by layoffs: lost opportunities, severe financial dislocation, the disruption of children's education, desperate travels around the country searching for equivalent work, consequent divorces and emotional problems, and bankruptcies....

Joint Exhibit F at 4. The special master determined that Continental Can aggravated damages through its deceptive behavior. This deception affected damages:

> The Court's holding that Continental's behavior at St. Louis was deceptive, and the allegations of similar deception at other plants, compelled the consideration of nonpecuniary losses such as emotional distress.

Joint Exhibit E at 20. The special master further stated:

> In a standard wrongful termination case, an accurate measure of loss may well be simply the difference between wages and benefits in one job and in its replacement. At the next level, where the motivation for the wrongful termination is discriminatory—say on grounds of age or race—damages are added for losses relating to the additional dignitary harm. In this litigation, the harm is more invidious yet, because the dignitary harm is no less and because of the additional harm caused by the concealment and deception that were alleged to have attended the discriminatory behavior.

Joint Exhibit E at 20–21.

The propriety of awarding such nonpecuniary damages was disputed by Continental Can. Continental Can argued that ERISA only provided equitable remedies and precluded compensatory damages. Joint Exhibit E at 10. The special master found, however, that the Supreme Court in *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), had recently rejected that position:

The Supreme Court's holding in *Ingersoll–Rand* possessed great significance for the range of remedies considered in this litigation and in its settlement. First, the holding provided authority for the Special Master's earlier ruling against the Defendants that the remedy in this case was not limited to contractual damages—pension benefits alone. Secondly, the holding provided authority for the Special Master's ruling admitting the introduction of testimony regarding mental anguish, emotional distress and other elements of non-pecuniary loss. Thirdly, the ruling made clear that punitive damages were available in ERISA § 510 cases .... he Supreme Court announced *Ingersoll–Rand* on December 3, 1990. Less than two weeks after the Supreme Court's decision, on December 16, 1990, serious settlement discussions began. These discussions ended successfully three days later, on December 19, 1990.

Joint Exhibit E at 24.

Continental Can's original position notwithstanding, the class action parties settled the litigation. Under the settlement agreement, Continental Can agreed to pay $415 million into a Settlement Fund which would, in turn, pay damages to the class members. In the settlement agreement the parties several times referred to "separate elements of damages." *See* Joint Exh. H at 3. The agreement provided that the actual distribution of monies to the claimants would occur as established in a plan of distribution to be approved by the court. *Id.* at 5.

Pursuant to the settlement agreement, on June 10, 1992, the special master initially submitted the Plan of Distribution, which was approved by the district court. The plan allocated the Fund monies among the class members. According to the Plan of Distribution, the amounts distributed had two components. The first component, denominated the "Basic Award," compensated the class members for "mental anguish, emotional distress and other elements of non-pecuniary loss."[7] The second component, called the

"Earnings Impairment Additur," compensated for economic loss. As to the latter element, the special master found that "the loss suffered by Continental workers was not simply earnings loss, but a loss of earnings capacity."[8] The Continental Can workers suffered a loss of earnings ability because their "skills and opportunities were diminished for their lifetimes."[9]

However, because the class of plaintiffs was very numerous, the special master determined that it was not possible to base awards entirely on individual circumstances. The approved Plan of Distribution approximated the damages that individuals were likely to have suffered:

> In the end, there was a clear choice between attempting greater precision and getting money into the hands of class members as quickly as possible. To attempt greater precision would have required making thousands of decisions concerning disputed facts. When would this plant have closed? When would Continental have laid off that class member? Did the layoff cause this class member's divorce and, if it did, what value should be put on that loss? How hard did that class member look for work and, had he looked harder, would he have found a decent job? ... There were thousands of questions to be answered and getting the answers could have taken years. During those years, class members would have been without any money from the settlement.[10]

Under the Plan of Distribution, the "Basic Award" was calculated on the basis of age and years of service with Continental Can and the "Earnings Impairment Additur" reflected economic damages, including lost wages.[11]

Lost earnings and other economic damages were determined to be irrelevant to the computation of a class member's Basic Award.

A class member's Basic Award is not affected by subsequent earnings history—for

---

7. Joint Exhibit E at 24.

8. Joint Exhibit E at 23

9. Joint Exhibit E at 26.

10. Joint Exhibit G at 5–6.

11. Joint Exhibit G at 9.

good or ill—or by any subsequent occurrence that might have affected post-layoff economic losses. For example, as described earlier, class members who died shortly after layoff receive full Basic Awards without regard to their shortened period of economic loss. Similarly, though the Earnings Impairment Additurs of class members who become disabled from work or who gain exceptional earnings after layoff will be affected by these developments, their Basic Awards are unchanged.[12]

The Plan of Distribution provided further:

The Plan of Distribution gives a central role to the Basic Award. It does so because every class member laid off from Continental suffered some harm, no matter what his or her subsequent employment experience was. Moreover, these harms differed from person to person. Some people lost homes, some people had to relocate, some people had to take jobs that were degrading or difficult.

\* \* \* \* \* \*

Finally, everyone suffered the stress, the stigma and the self-doubt that comes with losing a well-paid job. Each mother and father had to wonder if they had fallen in their children's esteem, whether neighbors judged them failures. Each had to worry whether they could meet the bills as they came due. Many couldn't, and so had to face the loss of homes, cars and bankruptcy.

See Joint Exhibit G at 11–13.

The central justification for defining the Basic Award in this manner is that the Basic Award—defined by age and years of service at layoff—is meant to compensate for the dignitary loss suffered by the alleged discrimination on grounds of age and work experience as employees approached the Continental pension benefit thresholds.

Admittedly, this is a crude proxy for those elements of non-pecuniary loss suffered by class members, especially mental anguish and emotional distress.[13]

The second component of the distribution, the Earnings Impairment Additur, reflected the economic impairment of each class member's employment prospects, including lost wages for any period of unemployment following the illegal discharge:

The second element of a class member's settlement share, the Earnings Impairment Additur was designed to provide compensation for loss in earnings capacity. It is not measured solely by the difference in earnings before and after Continental employment, but attempts to approximate—again, crudely—the long-term loss in employment prospects that faced most Continental employees whose skills and opportunities were diminished for their lifetimes.

See Joint Exhibit E at 26.

Over the years, an employee at Continental gained significant experience in canmaking as that employee's skills and abilities grew. With the loss of Continental employment, however, the economic value of that experience became questionable. Only rarely was another can-making job available where those skills had the same value as they did at Continental. . . . For these and other reasons, loss of a Continental job meant that a person lost economic value in the job market—his or her earnings ability was impaired. The Earnings Impairment Additur compensates for that loss.[14]

In 1992 plaintiff Michael A. Mayberry received a Basic Award of $16,145 and an Earnings Impairment Additur of $5,322, for a total award of $21,467. The factual bases for his award are undisputed.[15] Thereafter,

---

12. Joint Exhibit E at 25–26.

13. Joint Exhibit E at 26.

14. Joint Exhibit G at 15–16.

15. The specific circumstances of plaintiff Mayberry's layoff by Continental Can, as set forth in his written affidavit filed with this court, Joint Exhibit J, were not considered by the special master in either preparing the Plan of Distribution or in determining the amount to be distributed to Mayberry. Rather, the Basic Awards and the Earnings Impairment Additurs distributed to the class members were computed according to the formulation set out in the Plan of Distribution, Joint Exhibit G. However, as set forth above, the special master found that claimants had suffered losses similar to those described in Mayberry's affidavit.

the award of $21,467 was reduced to $19,595.56. This amount was reported on plaintiffs' 1992 federal income tax return, reflecting the deduction of employment taxes imposed on the employer but assumed as an obligation of the settlement fund under the settlement agreement.[16]

On December 14, 1993, plaintiffs filed a timely claim with the Internal Revenue Service seeking the refund of federal income taxes which they paid for tax year 1992 in the amount of $4,282.00 plus interest. The refund claimed is the amount by which plaintiffs' 1992 federal income tax was increased by reason of including in income the $19,595.56 received in 1992 from the Settlement Fund. The Internal Revenue Service disallowed plaintiffs' claim for refund on January 6, 1994.

A claim for the refund of the employment taxes in the amount of $1,499.07 plus interest was timely filed by plaintiffs on December 14, 1993. The refund claimed is the employee share of FICA taxes which was withheld from the 1992 payments of $19,595.56 made to plaintiff from the Settlement Fund. The IRS disallowed this claim on January 6, 1994.

## DISCUSSION

In the motions for summary judgment before the Court, plaintiffs argue that the Settlement Fund award to him was for personal injury damages which the Internal Revenue Code excludes from income. The defendant United States argues that the amounts distributed to plaintiff from the Settlement Fund, even though they were damages for personal injuries, are nevertheless not exempt from taxation because of the nature of the underlying claim.

*Income tax exclusion.*

■ IRC § 61(a) provides that, except as otherwise provided in the Code, gross income includes "all income from whatever source derived." 26 U.S.C. § 61(a). All funds or other increases in wealth received by a taxpayer are to be considered gross income, unless the taxpayer can demonstrate that the amount is specifically excluded by another section of the Code. *See Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 430–31, 75 S.Ct. 473, 476–77, 99 L.Ed. 483 (1955). Any such exclusion from income is to be narrowly construed. *See e.g., U.S. v. Wells Fargo Bank,* 485 U.S. 351, 354, 108 S.Ct. 1179, 1181–82, 99 L.Ed.2d 368 (1988).

Plaintiffs rely upon the exclusion established by IRC § 104(a)(2), which provides that "gross income does not include—

> ... (2) the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness...."

26 U.S.C. § 104(a)(2). In order to establish entitlement to this exclusion, the taxpayer must prove

> [first,] that the underlying cause of action giving rise to the recovery is "based upon tort or tort type rights"; and second, the taxpayer must show that the damages were received "on account of personal injuries or sickness."

*Commissioner v. Schleier,* 515 U.S. 323, 337, 115 S.Ct. 2159, 2167–68, 132 L.Ed.2d 294 (1995). Schlier sued his former employer in federal district court alleging that it terminated him from employment in violation of the Age Discrimination in Employment Act (ADEA). Schlier settled the litigation for payment of backpay and liquidated damages under the ADEA. The Supreme Court deter-

---

**16.** Federal taxes were withheld and remitted on Mayberry's award of $21,467: $630.69 as federal, state and local income tax withholding, $1,499.07 as employee FICA taxes and $1,871.44 in employer FICA and FUTA taxes. Under section 4 of the Settlement Agreement (Joint Exhibit H), the parties agreed that all taxes imposed on distributions from the Settlement Fund, including taxes normally imposed on the defendants, would be deducted from the amounts deposited in the Settlement Fund. Mayberry's post-tax cash

distribution was the balance: $17,465.80. A W–2 form was issued with respect to this distribution by Crown Beverage Packaging, Inc. (the corporate successor to Continental Can) and showed as 1992 income all but the employer FICA/FUTA share. The W–2 amount of $19,595.56 was reported by the Mayberrys on their 1992 federal income tax return. The court is advised that, like other class members, he also shares in residual distributions from the Settlement Fund.

mined that the amount representing the backpay was not excludable from gross income under § 104(a)(2) because it was not caused by personal injury. 515 U.S. at 330–31, 115 S.Ct. at 2164–65. The liquidated damages were held not excludable under § 104(a)(2) because they were punitive in nature, thus not compensation for personal injury. *Id.* at 332, 115 S.Ct. at 2165. In passing, the Court stated,

> though respondent's unlawful termination may have caused some psychological or 'personal injury' comparable to the intangible pain and suffering caused by an automobile accident, it is clear that no part of respondent's recovery of back wages is attributable to that injury.

*Id.* at 330, 115 S.Ct. at 2164. For the purposes of this tax refund action, the United States stated in oral argument that it agrees that the entire amount paid to plaintiff Mayberry from the settlement fund is to be considered as compensation to him for personal injury.

█ As expressed in the settlement agreement, in the plan of distribution, and in the judicial opinions issued in the litigation, and after a careful consideration of the nature of the claims made by the class claimants, the parties (the class plaintiffs and Continental Can), the special master, and the district court all expressly determined that the nature of most of plaintiff's settlement fund distribution was compensation for intangible, non-pecuniary personal injuries. The nature of the underlying class allegations and the expressed intent of Continental Can, as settlement money payor, and of the class action plaintiffs in characterizing the settlement amounts in this way are very important factors in determining whether any portion of the distribution qualifies for exclusion from gross income under IRC § 104(a)(2). *Delaney v. Commissioner*, 99 F.3d 20, 24 (1st Cir.1996); *Knuckles v. Commissioner*, 349 F.2d 610, 613 (10th Cir.1965); *Villaume v. United States*, 616 F.Supp. 185, 187 (D.Minn. 1985).

The fact that the distribution from the Settlement Fund was paid to plaintiffs on account of personal injury throws light upon the remaining IRC § 104(a)(2) issue of whether the recovery was "based upon tort or tort type rights." *Schleier*, 515 U.S. at 337, 115 S.Ct. at 2167. It is on this question that the United States joins issue. The answer to this issue typically requires consideration of the nature of the cause of action (whether tort or tort-type rights) sued upon which resulted in the recovery. As set forth above, plaintiff's claim was founded upon ERISA § 510 and relief was sought under § 502(a).

In *United States v. Burke*, 504 U.S. 229, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992), the taxpayer sought to exclude from income under § 104(a)(2) damages recovered under Title VII of the Civil Rights Act of 1964 for unlawful employment discrimination. Those monies were paid out by the employer as back pay under a settlement agreement; also pursuant to the settlement agreement, the employer withheld federal income taxes which the taxpayers sued to recover. 504 U.S. at 231, 112 S.Ct. at 1869. The Supreme Court held that the taxpayers had not shown "that Title VII, the legal basis for their recovery of backpay, redresses a tort-like personal injury...." *Id.* at 237, 242, 112 S.Ct. at 1872, 1875. The Court described the Congressional limitations of a cause of action under Title VII:

> The Court previously has observed that Title VII focuses on "legal injuries of an economic character ..., consisting specifically of the unlawful deprivation of full wages earned or due to services performed, or the unlawful deprivation of the opportunity to earn wages through wrongful termination. The remedy, correspondingly, consists of restoring victims, through backpay awards and injunctive relief, to the wage and employment positions they would have occupied absent the unlawful discrimination...." Nothing in this remedial scheme purports to recompense a Title VII plaintiff for any of the other traditional harms associated with personal injury, such as pain and suffering, emotional distress, harm to reputation, or other consequential damages (*e.g.*, a ruined credit rating.)

504 U.S. at 239, 112 S.Ct. at 1873 (citations omitted). The Court concluded its reason-

ing: "Thus, we cannot say that a statute such as Title VII, whose sole remedial focus is the award of back wages, redresses a tort-like personal injury within the meaning of § 104(a)(2) and the applicable regulations." *Id.* at 241, 112 S.Ct. at 1874.

The defendant United States argues that, like *Burke,* the class action plaintiffs in this action commenced their litigation under a statute which, after the settlement agreement in this action, has now been interpreted clearly as not authorizing recovery of the tort-like damages recovered by plaintiffs in the settlement agreement. The instant class actions, although alleging violations of ERISA § 510, were limited in their statutory relief to that provided by ERISA § 502(a). Section 502(a) in relevant part provides that a participant or beneficiary in an ERISA-regulated plan may bring a civil suit

> to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

or

> (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

*See* 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3).

In *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), the Court addressed the scope of remedial relief available under ERISA § 502. The issue before the Court was whether ERISA's breach-of-fiduciary duty provision, § 409(a) (29 U.S.C. § 1109(a)), enforceable under ERISA § 502(a)(2), authorizes an award of extracontractual [17] compensatory and punitive damages caused by improper or untimely processing of benefit claims. *Id.* at 136, 105 S.Ct. at 3087. The Court held that such relief was not available as a matter of law,

because ERISA did not provide expressly for the recovery of extracontractual damages. *Id.* at 146, 105 S.Ct. at 3092. Although *Russell* was limited to ERISA § 409(a), the remedial language of that provision ("such other equitable or remedial relief as the court may deem appropriate") is at least as broad as the remedial language of § 502(a)(3) ("other appropriate equitable relief").

In light of *Russell,* federal courts of appeals were almost unanimous in holding that extracontractual damages are not available under ERISA § 502. *See e.g., Novak v. Andersen Corp.,* 962 F.2d 757, 761 (8th Cir. 1992), *cert. denied,* 508 U.S. 959, 113 S.Ct. 2928, 124 L.Ed.2d 678 (1993); *Drinkwater v. Metropolitan Life Ins., Co.,* 846 F.2d 821, 824–25 (1st Cir.), *cert. denied,* 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988); *Reinking v. Philadelphia American Life Ins. Co.,* 910 F.2d 1210, 1219–20 (4th Cir.1990); *Medina v. Anthem Life Ins. Co.,* 983 F.2d 29, 32 (5th Cir.), *cert. denied,* 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993); *Harsch v. Eisenberg,* 956 F.2d 651, 660–61 (7th Cir.), *cert. denied,* 506 U.S. 818, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992); *Sokol v. Bernstein,* 803 F.2d 532, 538 (9th Cir.1986); *Lafoy v. HMO Colorado,* 988 F.2d 97, 99 (10th Cir.1993); *McRae v. Seafarers' Welfare Plan,* 920 F.2d 819, 821–23 (11th Cir.1991).

*Warren v. Society National Bank,* 905 F.2d 975, 980 (6th Cir.1990), *cert. denied,* 500 U.S. 952, 111 S.Ct. 2256, 114 L.Ed.2d 709 (1991), reached a contrary conclusion, holding that extracontractual damages could be recovered under § 502(a)(3) for a tax liability incurred because plan administrators failed to make a lump-sum pension distribution.

Thereafter, *Mertens v. Hewitt Associates,* 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), held that federal courts' authority to award "other appropriate equitable relief" under ERISA § 502(a)(3) is no broader than the authority to award "other equitable relief as the court deems appropriate" in Title VII. The Supreme Court held that ERISA § 502(a)(3) does not authorize a suit for com-

---

**17.** "Damages that would give a beneficiary more than he or she is entitled to receive under the strict terms of the plan are typically termed 'extracontractual.'" *Corcoran v. United Health-Care, Inc.,* 965 F.2d 1321, 1335 (5th Cir.) *cert, denied,* 506 U.S. 1033, 113 S.Ct. 812, 121 L.Ed.2d 684 (1992).

pensatory or punitive damages. *Id.* at 255, 258, 113 S.Ct. at 2068, 2069–70.

■ Defendant argues that the case at bar is like *Burke* in that the alleged violation of ERISA § 510 may have resulted in personal injuries that traditionally give rise to a tort-like cause of action, such as pain and suffering or mental distress. Defendant further argues that, under *Burke*, the decisive factor under § 104(a)(2) is not the injury suffered, but the injury remedied. *Burke*, 504 U.S. at 241, 112 S.Ct. at 1874. Defendant argues further that it is, therefore, the remedial statutory scheme under ERISA that determines whether the monies received by taxpayers are excludable under IRC § 104(a)(2). At this point, this court parts company with defendant.

Plaintiffs are entitled to the benefits of their bona fide settlement bargain, including the legal result that the settlement distribution is excludable from gross income under the Internal Revenue Code. First, as demonstrated above, the parties' intention was that the distribution represented compensation for actual personal injury. Neither the compensation paid nor the legal entitlement to the tax exclusion is a "windfall" to plaintiffs. *Cf., Dotson v. United States*, 87 F.3d 682, 695 (5th Cir.1996) (dissent).

Second, at the time the settlement was entered, the parties had a good faith belief that the settlement distribution, as compensation for personal injury, was within the remedial ken of ERISA § 502(a)(3). Shortly before the settlement, as the special master discussed concerning his conclusion that ERISA § 510 authorized "the full range of compensatory damages," [18] the Supreme Court commented on the relief available under § 510 in *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). That Texas state court judicial action, like the instant litigation, challenged as unlawful a discharge motivated by a desire to reduce pension costs. The Texas Supreme Court held that the plaintiff " 'was *not* seeking lost *pension benefits* but [was] instead seeking lost future wages, mental anguish and punitive damages as a result of the wrongful discharge.' " *Ingersoll–Rand*, 498 U.S. at 136, 111 S.Ct. at 481 (emphasis in original) (quoting *McClendon v. Ingersoll–Rand Co.*, 779 S.W.2d 69, 71 n. 3 (Tex.1989)). The United States Supreme Court granted certiorari and held that ERISA preempted the plaintiff's state law claims. As to the contention that the action involved remedies beyond ERISA, the Supreme Court stated:

> Not only is § 502(a) the exclusive remedy for vindicating § 510–protected rights, but there is no basis in § 502(a)'s language for limiting ERISA actions to only those which seek "pension benefits." It is clear that the relief requested here is well within the power of federal courts to provide.

498 U.S. at 145, 111 S.Ct. at 486. This language in the *Ingersoll–Rand* opinion provided a basis in law for the settlement of the *McLendon/Gavalik* litigation.[19] Ultimately, the non-pecuniary losses which were understood by the parties to be available under ERISA were actually paid and recovered by plaintiff Mayberry.

After *Ingersoll–Rand* and after the settlement in this litigation, the Supreme Court revisited the issue of ERISA relief and found that ERISA remedies were strictly limited to equitable remedies. *Mertens v. Hewitt Associates*, 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). Certain courts have concluded that the *Mertens* ruling is applicable to disqualify the federal tax refund claims of the *McLendon/Gavalik* class. *See Hemelt v. United States*, 122 F.3d 204 (4th Cir., 1997); *Gerbec v. United States*, 957 F.Supp. 122 (S.D.Ohio 1997).

However, this Court agrees with the ruling of *Dotson v. United States*, 87 F.3d 682 (5th Cir.1996). In *Dotson*, also one of the test cases of the *McLendon/Gavalik* litigation, the court of appeals found that the award to class member Dotson included damages for "dignitary injuries, emotional distress, and non-pecuniary loss," *Dotson* at 688, as well as "some measure of back wages" and "future lost wages." *Id.* at 689. The court held that the portion of the damages due to dignitary injuries, emotional distress and non-pecuni-

18. Joint Exhibit E at 14.

19. Joint Exhibit E at 23.

ary losses were excludable from income under IRC § 104(a)(2) but that the portion of the award which represented back pay was taxable.[20]  *Id.* at 688–89.

■  Because the bona fide intention of the settling payor and recipients at the time of the settlement agreement is a cardinal consideration, and because it is undisputed that the settlement distribution paid to Mayberry represented compensation for actual personal injury, the tax consequences of the damages recovered in the *McLendon/Gavalik* settlement must be determined as of the state of the law and the facts when the settlement was agreed upon.  Bona fide settlements must not be burdened with the prospects that the current decision-making, reasonable and consistent with the law when made, would be rendered nugatory by a retrospective application of a new understanding of the law, even of the statutory law upon which the original settlement was founded.  Similar interests in finality attend federal taxation.  As stated by the court in *Dotson:*

> The interests of both taxpayers and the government in finality and predictability of taxation strongly support classifying legal judgments or settlements according to the understanding of the law at the time of the settlement.

*Dotson,* 87 F.3d at 687.

Federal court decisions before *Dotson* agreed and refused to reopen for tax purposes the merits of a claim for damages which was settled under one theory of damages, but which could be taxed more advantageously if that theory was reconsidered and revised.  In *Howard v. Commissioner,* 447 F.2d 152 (5th Cir.1971), the court rejected the government's contention that amounts paid in good faith to settle a claim for damages should, in a later tax case, be reconsidered in light of the government's view of the claim for damages.  *Id.* at 157.  *See also Reese v. United States,* 28 Fed.Cl. 702, 711 (1993), *aff'd,* 24 F.3d 228 (Fed.Cir.1994).

A similar conclusion was reached by the Court of Appeals for the Ninth Circuit, that damages awarded for a wrongful discharge are excludable under IRC § 104(a)(2), notwithstanding a subsequent decision from the California Supreme Court that only contract damages, not tort damages, were available to remedy the taxpayer's state law claims.  *Redfield v. Insurance Co. of N. Am.,* 940 F.2d 542 (9th Cir.1991).  In the words of the court, subsequent decisions

> cannot retroactively alter the character of damages already awarded Redfield and affirmed on appeal.

*Id.* at 548 n. 2.

The Tax Court has expressed this principle in rulings affirmed by the United States Courts of Appeals for the Third, Fifth and Sixth Circuits.[21]  And in *Dotson* this principle was applied by the Fifth Circuit to the very facts at issue in the present case:

> The characterization of damages received is not affected by the shifting sands of statutory interpretation after a bona fide settlement has been reached or a damage award rendered....  The characterization of the settlement depends upon the determination that the damages were received through prosecution of a legal suit or action based upon tort or tort-type rights....  Treasury Reg. 26 C.F.R. 1.104–1(c).  The fact that such a remedy

---

20.  That distinction is avoided in this action because, for the purposes of this action, the United States has agreed that the entire settlement distribution to plaintiff was in compensation for personal injury.

21.  *Seay v. Commissioner,* 58 T.C. ·32, 37, 1972 WL 2542 (1972) ("[T]he petitioner does not have to prove the validity of his claim; rather, he must show the nature of the claim which was the actual basis for the settlement"); *Metzger v. Commissioner,* 88 T.C. 834, 859, 1987 WL 49302 (1987), *aff'd,* 845 F.2d 1013 (3d Cir.1988); *Robinson v. Commissioner,* 102 T.C. 116, 126, 1994 WL 26303 (1994) ("[T]he nature of the claim underlying the taxpayer's damage award, rather than the validity of his or her claim, determines whether he or she received the damages on account of tortlike personal injuries"), *aff'd in part. rev'd in part,* 70 F.3d 34 (5th Cir.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 83, 136 L.Ed.2d 40 (1996); *Threlkeld v. Commissioner,* 87 T.C. 1294, 1297, 1986 WL 22061 (1986) ("The law is well settled that the tax consequences of an award for damages depend upon the nature of the litigation and on the origin and character of the claims adjudicated, and not upon the validity of those claims"), *aff'd,* 848 F.2d 81 (6th Cir. 1988).

may no longer exist is irrelevant to the determination of the character of a settlement to be taxed.

*Dotson,* 87 F.3d at 686. *Contra, Hemelt v. United States,* 951 F.Supp. 562, 565–68 (D.Md.1996), *aff'd,* 122 F.3d 204, 1997 WL 442680 (4th Cir., Aug.7, 1997).

For these reasons, the Court grants summary judgment to the plaintiff on the ground that the settlement fund distribution to plaintiff Mayberry is excludable from gross income under IRC § 104(a)(2).

### Employment taxes.

Plaintiffs also seek a refund of the employment taxes which were paid under the Federal Insurance Contributions Act (FICA), 26 U.S.C. §§ 3101–3127, and the Federal Unemployment Tax Act, 26 U.S.C. § 3301–3311, as deductions from the gross settlement distribution. *See footnote* 16 above. FICA imposes "on the income of every individual a tax equal to . . . [a certain percentage] of the wages (as defined in section 3121(a)) received by him with respect to employment (as defined in section 3121(b))." IRC § 3101(a) (1988). Similarly, FUTA requires an employer to pay unemployment tax on a portion of an employee's wages. *Id.* § 3301 (1988). For FICA and FUTA purposes, the term "wages" means "all remuneration for employment" unless a statutory exemption is applicable. *Id.* §§ 3121(a), 3306(b) (1988). The term "employment" generally includes any service, of whatever nature, performed by an employee for the person employing him. *Id.* §§ 3121(b), 3306(c) (1988).

Defendant United States argues that, because the Basic Award component of the settlement distribution was calculated upon plaintiff's age and seniority with Continental Can Company and because the Earnings Impairment Additur was based upon his earnings history, the settlement distributions are wages as "remuneration for employment." The Court disagrees with defendant.

First, defendant has agreed, for the purposes of this action, that the settlement distribution to plaintiff Mayberry was in compensation for personal injury. Nothing in the record indicates that plaintiff Mayberry was not fully compensated for his services to Continental Can Company at the agreed upon wage and other benefit rate. The settlement distribution was not compensation for services provided by Mayberry to the employer. The cases cited by defendant do not support its position.

In *Lane Processing Trust v. United States,* 25 F.3d 662 (8th Cir.1994), the proceeds of the sale of the employer, the ownership of which had been transferred to the employees, were considered "wages" subject to employment taxes because

> the distributions in this case were linked to location, prior wages, length of service, and other factors traditionally used to determine employee compensation. . . .

25 F.3d at 666. While the actual amounts of the settlement distribution to the *McLendon/Gavalik* class members may have been calculated on similar factors, the money actually distributed was in compensation for personal injuries sustained after employment ended. Nothing in *Lane Processing Trust* indicated that the ownership interest was in compensation for any extra-employment personal injury.

In *STA of Baltimore–ILA Container Royalty Fund v. United States,* 621 F.Supp. 1567 (D.Md.1985), *aff'd,* 804 F.2d 296 (4th Cir.1986), the money at issue was distributed via a collective bargaining agreement to "reimburs[e] longshoremen for the lost work which resulted from containerization." 621 F.Supp. at 1569. The district court held that the distribution was "supplementary pay . . . . based on services actually performed and is clearly 'remuneration for employment' pursuant to § 3121(b)." *Id.* at 1572. The distribution to plaintiff Mayberry was not supplemental pay. And it was not backpay resulting from unlawful discharge. Cf., *Social Security Board v. Nierotko,* 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946); *Tanaka v. Dept. of Navy,* 788 F.2d 1552, 1553 (Fed.Cir.1986); *Ainsworth v. United States,* 185 Ct.Cl. 110, 399 F.2d 176, 185–86 (1968).

The court agrees with the district court in another of the instant test cases, *Gerbec v. United States,* 957 F.Supp. 122, 125 (S.D.Ohio 1997): "Plaintiffs had already received full payment for the services they

performed for Continental; thus, the settlement could not represent wages or remuneration for employment." *See also Dotson v. United States,* 87 F.3d 682, 689–90 (5th Cir. 1996).

The rationale of *Hemelt v. United States,* 122 F.3d 204, 209–10 (4th Cir.1997), characterizing the settlement distribution in this case as wages is not persuasive. Because *Mertens v. Hewitt Associates,* 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), "forbids recovery under section 502 of ERISA for emotional and intangible injuries," *id.,* does not mean that *Mertens* "thus forbids the characterization of the settlement payments that taxpayers seek." *Id.* Rather, as set forth above, it is for the settlement payor and the settlement payees, in a bona fide claim and settlement context, based upon a reasonable understanding of the then current law, to characterize the settlement payments.

For these reasons, summary judgment will be granted to plaintiff Mayberry for a refund of the federal income and employment taxes, plus interest, levied upon the settlement fund distribution to him.